IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| BILLY B. LAUN, II, D.D.S., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | Civil Action No. 1:18CV-00033-JRH-BKE |
| | * | |
| BOARD of REGENTS of the | * | |
| UNIVERSITY SYSTEM of | * | |
| GEORGIA d/b/a AUGUSTA | * | |
| UNIVERSITY[1], | * | |
| | * | |
| | * | |
| Defendant. | * | |

**DEFENDANT'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Board of Regents of the University System of Georgia,

including its unit institution Augusta University[2], by and through counsel of

---

[1] August University ("AU") is not a proper defendant to this lawsuit as it exists and operates solely as a unit of the Board of Regents ("BOR"). *See* O.C.G.A. §§ 20-3-31 and 20-3-32; *see also* GA. CONST. 1983, art. VIII, § 4, ¶ 1(b); *McCafferty v. Medical College of Ga.*, 249 Ga. 62, 65 (1982) (holding that the Medical College of Georgia, as a unit of the Board of Regents of the University System of Georgia, is not a legal entity capable of being sued).

[2] Augusta University was known as the Georgia Health Sciences University, Georgia Regents University, and Augusta University at different times pertinent to this action.  Thus, to minimize confusion, instead of referring to each name of the university, Defendant will be solely referred to as Augusta University and/or "AU" throughout this motion for summary judgment.

1

record, the Attorney General of the State of Georgia, and submits this Brief in support of its Motion for Summary Judgment.  Defendant shows that there is no genuine issue as to any material fact and therefore Defendant is entitled to judgment as a matter of law.

## I.     <u>INTRODUCTION</u>

Plaintiff Billy B. Laun, II, D.D.S. ("Plaintiff") was employed at AU as an Oral Maxillofacial Surgery ("OMFS") Resident in the Dental College of Georgia ("DCG") from July of 2012 until he was terminated on June 2, 2016.  Plaintiff brings the instant lawsuit alleging violations under Title I and Title II of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq*. ("ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. ¶ 794, *et seq*., as amended ("Rehab Act") for failure to accommodate and disability discrimination.  Plaintiff additionally brings claims for breach of contract and violation of due process under the Fourteenth Amendment of the United States.

The undisputed material facts show, however, that prior to his termination Plaintiff never requested any form of accommodation, and the accommodation request he made after his termination was unreasonable. Furthermore, AU's decision to terminate Plaintiff was based on legitimate, non-discriminatory reasons:  Plaintiff's ongoing misconduct and insubordination. Additionally, Plaintiff's claims for breach of contract and violation of procedural due process fail

because he had no contractual agreement with AU, and, even assuming there was a quasi-contractual agreement between Plaintiff and AU, no provisions of this quasi-contract were breached and Plaintiff was given due process by AU. Defendant, therefore, is entitled to summary judgment on all claims.

## II.   STATEMENT OF MATERIAL FACTS

To avoid redundancy, Defendant respectfully requests that its concurrently filed Statement of Undisputed Material Facts as to Which There is No Genuine Issue to be Tried be incorporated herein as its statement of facts for its legal arguments.  In addition, numerous relevant facts are integrated into the arguments below.

## III.   SUMMARY JUDGMENT STANDARD

Defendant is entitled to summary judgment because there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c).  When filing for summary judgment, a Defendant meets its burden by showing "that there is an absence of evidence to support the [Plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). After Defendant demonstrates that there is no genuine issue of material fact, the burden shifts to Plaintiff to show that there is a jury question for trial. *Id*.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247-248 (1986) (emphasis in original).

## IV.   ARGUMENT AND CITATION OF AUTHORITIES

### a.   Plaintiff's Claims for Failure to Accommodate and Disability Discrimination under the ADA and the Rehab Act Fail.

The ADA requires an employer to make reasonable accommodations that

allow a disabled individual to perform his job, unless that accommodation would

cause an undue hardship.  *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1262 (11th

Cir. 2007), 42 U.S.C. § 12112(b)(5)(A).  The Rehab Act provides that no otherwise

qualified individual with a disability will solely by reason of his disability be

excluded from participation in, be denied benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial

assistance. 29 U.S.C. ¶ 794(a).   "The standard for determining liability under the

Rehabilitation Act is the same as that under the Americans with Disabilities Act."

*Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).  "[T]hus, cases involving

the ADA are precedents for those involving the Rehabilitation Act[3]." *Id.; see also*

29 U.S.C. § 794(d).

---

[3] Because the standard for determining liability under the Rehabilitation Act is the same as that under the Americans with Disabilities Act, for the sake of judicial economy, Defendant will analyze Plaintiff's ADA claims in conjunction with Plaintiff's Rehab Act claims

       i.  <u>Plaintiff Cannot Establish a Prima Facie Case of Denial of Reasonable Accommodation Pursuant to the ADA and Rehabilitation Act</u>.

In order to state a prima facie claim for failure to accommodate, the plaintiff must show that: (1) he is disabled, (2) he is a qualified individual, and (3) he was discriminated against by the defendant's failure to provide a reasonable accommodation.[4]  *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255-56 (11th Cir. 2001).  Even assuming, without conceding, that Plaintiff could establish the first and second elements of the prima facie case, Plaintiff's claims still fail because he cannot establish the third element of the prima facie case. Specifically, Plaintiff cannot show that he was discriminated against by Defendant's failure to provide a reasonable accommodation.

The ADA requires an employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).  "A qualified individual with a disability may be unlawfully discriminated against because of the individual's disability

---

[4] The term **"reasonable accommodation"** may include part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, etc., but it does not require an employer to provide the accommodation of the employee's choosing.  42 U.S.C. § 12111(9)(B); *see* 29 C.F.R. § 1630.2(o)(2)(ii); *Stewart v. Happy Herman's Cheshire Bridge,* 117 F.3d 1278, 1285 (11th. Cir. 1997) (*citing Lewis v. Zilog, Inc.,* 908 F. Supp. 931, 947 (N.D. Ga. 1995)).

when the individual's employer does not reasonably accommodate the disability."
*Id*.; *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th
Cir. 1997).  "Whether an accommodation is reasonable depends on specific
circumstances."  *Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998).

    The "use of the word 'reasonable' as an adjective for the word
'accommodate' connotes that an employer is not required to accommodate an
employee in any manner in which that employee desires."  *Stewart*, 117 F.3d at
1285 (citing *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 947 (N.D. Ga. 1995)).  In cases
such as this, the plaintiff bears the burden of identifying an accommodation and
demonstrating that the accommodation allows him to perform the job's essential
functions, as does the ultimate burden of persuasion with respect to demonstrating
that such an accommodation is reasonable.  *Anderson*, 418 Fed. Appx. at 883-884
(citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255-56 (11th Cir. 2001));
*Stewart*, 117 F.3d 1278, 1286 (11th Cir. 1997); *Willis v. Conopco, Inc.*, 108 F.3d
282, 283 (11th Cir. 1997).

    Accommodations are "reasonable" only if they will allow the employee to
perform the essential functions of his job.  *Shannon v. Postmaster Gen. of United
States Postal Serv.,* 335 Fed. Appx. 21, 25 (11th Cir. 2009).  Conversely, "an
accommodation that does not enable the employee to perform an essential function
of his position is facially unreasonable and is not required by the ADA."  *Holly v.*

*Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007).

Furthermore, the "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999); *Cazeau v. Wells Fargo Bank, N.A.*, No. 14-14863, 2015 U.S. App. LEXIS 9657 (11th Cir. June 10, 2015) (holding that because no specific demand for an accommodation was made, employer had no duty to provide a reasonable accommodation). Thus, an employee's failure to request a reasonable accommodation is fatal to his case. *Warren v. Volusia Cnty.*, 188 Fed. Appx. 859, 863 (11th Cir. 2006) (rejecting the employee's argument that her right to an accommodation was triggered where the employer knew of "her disability, her limitations, and her desire to return to work" but the employee did not specifically request an accommodation); *McCarroll v. Somerby of Mobile, LLC*, 595 Fed. Appx. 897, 899 (11th Cir. 2014) (finding an employee's comment to his supervisor that "he was 'too sore to work' was not specific enough to constitute a demand for a reasonable accommodation").

Here, Plaintiff never asserted any request for accommodation during his OMFS residency. (Stevens Aff., ¶¶ 25-26; Ferguson Aff., ¶¶ 39-40: Lefebvre Aff., ¶¶ 24, 28; Arnold Aff., ¶ 35; Powell ¶ 26; Hanes Aff., ¶ 31). Prior to his termination, Plaintiff filed one disability complaint with the Office of Employment

Equity("OEE") in December of 2015, alleging that the OMFS Department was discriminating and taking negative actions against him for being "perceived as" having a disability. At no point did Plaintiff ever indicate that he was asking for any type of accommodation related to any fitness for duty evaluation[5] or for any medical condition. To the contrary, Plaintiff informed the OEE Director, Glenn Powell, that after completing the fitness for duty evaluation and subsequent treatment, he was cleared by his doctor and had no restrictions related to his return to work. (Powell Aff., ¶ 21). Because Plaintiff simply believed that he was "regarded as" having a disability by others at AU, Plaintiff had no need for, nor was he entitled to, any type of reasonable accommodation. (Powell Aff., ¶¶ 6-7).

It was not until after Plaintiff was already terminated from the OMFS department that Plaintiff ever asserted that he had any type of disability or required any sort of accommodation. Specifically, Plaintiff filed a second EEO disability discrimination complaint and accommodation request on July 18, 2016, stating that he suffered from a disability, and claimed that he was not provided the reasonable accommodation of mediation prior to being terminated. (Powell Aff., ¶¶ 28-32, Ex. 5).  After investigating Plaintiff's complaint and accommodation request, Powell determined that mediation was not a reasonable accommodation because the AU

_____

[5] Plaintiff's Fitness for Duty Evaluation is discussed in more detail below in Section IV(a)(ii).

mediation policy was voluntary, both parties must agree on the outcome, and mediation was not the proper venue to address serious, employment actions, such as termination, which was covered by AU's formal grievance policies and procedures that Plaintiff had already exhausted. (Powell Aff., ¶¶ 33-36, Ex. 6).

Because Plaintiff did not ask for any accommodation while he was employed at AU, the duty to provide a reasonable accommodation was not triggered.  Furthermore, to the extent that Plaintiff requested mediation after he was already terminated, for the same reasons that Powell listed, Plaintiff cannot show that mediation was a reasonable accommodation or how it would have allowed him to perform the essential functions of his job. As such, Plaintiff's claims for failure to accommodate under the ADA and Rehab Act fail.

      ii.  <u>Plaintiff cannot establish that the decision to terminate him was made based upon any actual or perceived disability.</u>

Plaintiff's disability discrimination claims[6] also fail as he cannot establish that he was terminated because of any actual or perceived disability.  Under the *McDonnell Douglas*[7] burden-shifting scheme for discriminatory treatment cases, in the absence of direct evidence of discrimination, an ADA (and/or Rehab Act)

---

[6] Just as with claims for failure to accommodate, claims of disability discrimination under the ADA and the Rehab Act are analyzed under the same standards. *See Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2001).

[7] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

plaintiff must first establish a *prima facie* case of discrimination[8].  The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action, and if the employer meets this burden, a presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextural.   *Web v. Donley*, 347 F.App'x 443, 445 (11th Cir. 2009) (applying *McDonnell Douglas* burden-shifting analysis to claims under the Rehab Act).  "It is not enough for a plaintiff to demonstrate that an adverse employment action was based partly on his disability. [Cit. omitted]. Rather, … a plaintiff must prove that he suffered an adverse employment action 'solely by reason of' his [disability]. 29 U.S.C. § 794(a)." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

Assuming *arguendo* that Plaintiff can establish a *prima facie* case of discrimination, which Defendant expressly denies, Plaintiff's claims still fail because Defendant had legitimate, non-discriminatory reasons for terminating him in June of 2016, his "rude or discourteous behavior" and his "insubordination or

---

[8] In order to establish a *prima facie* case disability discrimination, the Plaintiff must demonstrate that (1) he has a disability; (2) he is otherwise qualified for the position; and (3) he was subjected to unlawful discrimination as the result of his disability. *Sutton v. Lader*, 185 F.3d 1203, 1207 (11th Cir. 1999).

willful disobedience," in addition to numerous other well-documented behavioral and performance problems.

Beginning very early in his residency, the OMFS Department Chairman, Dr. Stevens, and the OMFS Program Director, Dr. Ferguson, began receiving complaints about Plaintiff from numerous faculty and employees both within as well as outside of the DCG. (Stevens Aff., ¶¶ 16-17, Ex. 1-24; Ferguson Aff., ¶¶ 19, 21, Ex. 4-25; Lefebvre Aff., ¶ 6; Hanes Aff., ¶ 11).  Complaints ranged from Plaintiff's "dismissive and disinterested" attitude and about how "he [came] across like he [knew] everything already," to how Plaintiff was "extremely disrespectful and loud," "demonstrated inappropriate behavior to other administrative/ clerical personnel in CODM," and that "[Plaintiff] [was] a very difficult person to work with. He is not aware of his limitations and lacks good clinical judgment. He is disrespectful, confrontational and unable to follow directions. He argues about everything *(sic)* clinical decision and does not know when to stop. All this things *(sic)* make him unreliable and dangerous."  (Stevens Aff., ¶¶ 30-31, Ex. 1-2, 4, 6; Ferguson Aff., ¶ 4-5, 7, 26). Several of the complaints about Plaintiff also involved concerns for patient safety. (Stevens Aff., ¶ 16; Ferguson Aff., ¶¶ 20-21; Lefebvre Aff., ¶ 7, Ex. 1-5). In addition to the complaints they received about Plaintiff, both Dr. Ferguson and Dr. Stevens also had several personal encounters with Plaintiff wherein they believed Plaintiff acted in a rude, disobedient, or insubordinate

manner to them. (Stevens Aff., ¶¶ 18-19, Ex. 25-27; Ferguson Aff., ¶¶ 22-23, Ex. 26-29). When complaints about Plaintiff were initially received, Dr. Ferguson would verbally counsel Plaintiff; however, despite these verbal counseling sessions, Plaintiff's behavior did not improve and he continued to act in a rude, unprofessional, and insubordinate manner. (Ferguson Aff., ¶ 24; Lefebvre Aff., ¶ 6; Hanes Aff., ¶ 11).

After numerous failed verbal counseling attempts, Dr. Ferguson reported Plaintiff for two different Code of Conduct violations in March and June of 2015. (Ferguson Aff., ¶¶ 28-29, 36-37, Ex. 31, 35; Lefebvre Aff., ¶ 12; Hanes Aff., ¶¶ 12-15, Ex. 2-3). In the first Code of Conduct violation report, Plaintiff was written up for his failure to obtain clearance from either the Chief Resident or any of the attending doctors before leaving the OMFS resident clinic to participate in a surgical case, which Plaintiff had previously received both verbal and written warnings about not doing.  (Ferguson Aff., ¶¶ 25-27, Ex. 30; Lefebvre Aff., ¶ 10; Stevens Aff., ¶¶ 19-20, Ex. 27).

Dr. Ferguson filed a second Code of Conduct violation against Plaintiff in June of 2015 based on reported interactions with Plaintiff's OMFS co-resident, Dr. Paquin, wherein Plaintiff was aggressive and referred to her as a "bitch" several times.  (Stevens Aff., ¶¶ 21-22, Ex. 28; Ferguson Aff., ¶¶ 32-33, 36-37, Ex. 33, 35; Lefebvre Aff., ¶ 12; Hanes Aff., ¶ 14-15, Ex. 3). The investigative subcommittee

tasked to investigate Plaintiff's June 2015 Code of Conduct violation reported that an alarming number of people interviewed expressed concerns about their safety based on Plaintiff's unpredictable behavior. (Lefebvre Aff., ¶ 14, Ex. 6, pp. 8-9, 11-13).

Based on the reports of Plaintiff's recent aggressive interactions with Dr. Paquin, the safety concerns of various OMFS faculty members and employees, as well as the disclosures from the investigative subcommittee that numerous individuals were concerned for their safety because of Plaintiff's unpredictable behavior, a decision was made in late June of 2015 by DCG Dean Dr. Carol Lefebvre, AU Medical Center Chief Integrity Officer James Rush, and AU Director of Employee Relations Debra Arnold, to have Plaintiff evaluated for his fitness for duty. (Rush Aff., ¶¶ 5-6; Lefebvre Aff., ¶ 16; Arnold Aff. 18; Hanes Aff., ¶ 16).

In August of 2015, Plaintiff underwent evaluations through Vanderbilt University's Comprehensive Assessment Program (VCAP) and subsequent treatment at the Professional Renewal Center, a facility in Kansas, after it was determined that Plaintiff was unfit for duty. (Rush Aff., ¶¶ 9-12; Arnold Aff., ¶ 19; Lefebvre Aff., ¶ 23). Plaintiff was eventually determined to be fit for duty again sometime in or around November of 2015. (Rush Aff., ¶¶ 11-12; Lefebvre Aff., ¶ 23).

Prior to his return to the OMFS program, Plaintiff was informed that he would be subject to an assessment phase and probationary period and was also provided with a list of the OMFS faculty's expectations of him upon his return to residency. (Lefebvre Aff., ¶¶ 25-27, Ex. 11). Among the expectations listed were that no insubordination or derogatory comments made by Plaintiff would be tolerated, and that if he did not meet the stated expectations, he would be immediately terminated. (Lefebvre Aff., Ex. 11).  On February 12, 2016, Dr. Stevens had a meeting with Plaintiff, wherein he provided Plaintiff with a written memorandum about the faculty's evaluation of Plaintiff during his assessment and probationary period. (Stevens Aff., ¶¶ 27-28, Ex. 29). The OMFS faculty found, among other things, that Plaintiff did not demonstrate collegiality, was inconsiderate and lacked empathy towards his peers and faculty, that he challenged the authority of faculty members by crossing the line between an assertive inquiry and aggressive, accusatory manner of inquiry, that he displayed superiority and self-importance tendencies, and that he bullied department personnel to the point that many faculty, residents, and staff indicated they were afraid to converse with him even when communication was required. (Stevens Aff., Ex. 29).

On February 19, 2016, Dr. Stevens gave Plaintiff a second memorandum concerning the OMFS staff's expectations for his improvement, which Plaintiff, in a display of complete and utter insubordination to his supervisor, purposefully tore

up in front of Dr. Stevens and a witness. (Stevens Aff., ¶¶ 29-31, Ex. 30-31; Lefebvre Aff., ¶¶ 28-29).  During Plaintiff's probationary period and even after Plaintiff was given the expectations for improvement memorandum, Dr. Stevens and Dr. Ferguson continued to observe firsthand and receive complaints about Plaintiff's behavior, insubordination, and inability to follow instructions as well as concerns about Plaintiff's patient safety. (Stevens Aff., ¶¶32-36, Ex. 32-35; Ferguson Aff., ¶¶ 40-41, Ex. 36-39; Lefebvre Aff., ¶¶ 35-36, Ex. 16;  Hanes Aff., ¶ 22).

On March 1, 2016, an incident occurred between Plaintiff and Denise Webster in the legal affairs office, wherein Plaintiff became aggressive towards Webster after she would not connect his phone call, and told her that "he would have her job." (Lefebvre Aff., ¶¶ 30-32, Ex. 13; Arnold Aff., ¶¶ 20-22, Ex. 5). Because of this incident with Plaintiff, Webster was fearful for her safety, so Plaintiff was suspended and Arnold conducted an investigation into the incident. *Id*. Based on her investigation into the matter, Arnold found that Plaintiff "violated work rule #18 threatening, engaging in threatening behavior (physical/verbal), or fighting in the workplace towards a coworker, supervisor, patient, or any individual within the institution or enterprise" and that on the first offense, Plaintiff was subject to suspension or discharge, and for the second violation, he faced discharge. (Arnold Aff., Ex. 5).

On April 22, 2016, Dr. Stevens issued Plaintiff a final warning letter. (Stevens Aff., ¶¶ 40, 43, Ex. 37; Lefebvre Aff., ¶¶ 41-42, Ex 19). In the letter, Dr. Stevens stated that based on the finding in the Webster investigation that Plaintiff violated work rule 18, "engaging in threatening behavior (physical/verbal), or fighting in the workplace towards a co-worker, supervisor, patient, or any individual within the institution or enterprise," Plaintiff was receiving a final warning. (Stevens Aff., Ex. 37). In addition to the Webster incident, Dr. Stevens indicated that another matter of concern was that Plaintiff's behavioral issues continued even after his return from his leave of absence. (Stevens Aff., Ex. 37). Based on these findings, in addition to several other cited incidents of misconduct, Dr. Stevens advised Plaintiff that he was "in violation of AU work rules, published OMS guidelines, [Plaintiff's] improvement plan, and potentially the DCG Advanced Education Code of Conduct," and that the letter served as Plaintiff's final warning that "any further violations of AU work rules, OMS department guidelines, or [Plaintiff's] improvement plan *[would] result in discharge from the OMS residency program and [AU]*. Should another event occur, [he would] be immediately suspended, an investigation [would] be conducted and the final outcome [would] determine [his] status."  (Stevens Aff. ¶ 42, Ex. 37).

On May 17, 2016, after Plaintiff could not be located in the OMFS resident clinic and he was paged, instead of simply reporting to the clinic as was expected

and required of him, Plaintiff unnecessarily went into Dr. Ferguson's office to discuss the page and bring up some issues that he had brought up previously that were already addressed. (Ferguson Aff., ¶¶ 15, 42-43; Arnold Aff., Ex. 8). After finally leaving the office a first time, Plaintiff returned uninvited to Dr. Ferguson's office later that afternoon to continue this same discussion, during which Plaintiff called Dr. Ferguson a liar. (Ferguson Aff., ¶¶ 44-45).

After this incident occurred, Plaintiff was placed on suspension until Arnold and Rush could complete an independent investigation of the event. (Stevens Aff., ¶¶ 44-46; Lefebvre Aff., ¶¶ 43-44; Arnold Aff., ¶ 26; Rush Aff., ¶¶ 15, 17; Ferguson Aff., ¶ 46). When Rush and Arnold issued their investigative report of the May 17, 2016 incident, they found that Plaintiff had no reason to go to Dr. Ferguson's office after he was paged and that he used that opportunity "to bring up past issues which in that moment was inappropriate and not warranted," which "violated the expectations set forth in his final warning letter…" (Arnold Aff., ¶¶ 27-28, Ex. 8, p. 3; Rush Aff., Ex. 8, p. 3).

On June 2, 2016, Dr. Stevens presented Plaintiff with a termination letter which explained that the incident on May 17, 2016 between Dr. Ferguson and Plaintiff was a violation of Plaintiff's April 22, 2016 final warning letter and that Plaintiff's employment with AU was terminated immediately for violating AU work rule 4 "rude or discourteous behavior towards patients or other persons at

17

[AU]," and work rule 13 "insubordination or willful disobedience."  (Stevens Aff., ¶¶ 48-49, Ex. 38; Arnold Aff., ¶¶ 32-33, Ex. 9; Lefebvre Aff., ¶ 48).

Here, despite exhaustive attempts by the OMFS and DCG faculty to counsel Plaintiff, and multiple opportunities allowing him to modify his inappropriate behavior, Plaintiff repeatedly exhibited rude and discourteous behavior and continued to act in an insubordinate and willfully disobedient manner. Even after Plaintiff was given a final warning letter, which explicitly stated that any further violations of AU's policies would result in his discharge, Plaintiff still felt it necessary to engage in further misconduct and insubordinate acts by entering his supervisor's office to bring up past issues and call him a liar.  Because of Plaintiff's acts and behavior on May 17, 2016, in conjunction with all of Plaintiff's previous behavior and misconduct issues, AU had legitimate, non-discriminatory reasons to terminate Plaintiff's employment.

       iii.  <u>Plaintiff cannot present any evidence of pretext to rebut Defendant's legitimate, nondiscriminatory reasons for his termination.</u>

Since Defendant has met the relatively light burden of articulating legitimate, nondiscriminatory reasons for Plaintiff's termination, Plaintiff must now prove by a preponderance of the evidence that the articulated reasons are a mere pretext for intentional discrimination. *Burdine*, 450 U.S. at 256.  To prevail, Plaintiff must demonstrate that the articulated reason is not the true reason and that

the "true reason" constitutes unlawful discrimination. *Hicks*, 509 U.S. at 508. The plaintiff must present significant probative evidence. *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir. 1996).

Federal courts do not sit to second guess the business judgment of employers, and must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538, 1543 (11th Cir. 1997), *cert. denied sub. nom, Combs v. Meadowcraft, Co.*, 118 S. Ct. 685 (1998). An employer may take adverse action for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).

Thus, the only question for the Court at the pretext stage of analysis is whether the decisions at issue were motivated by "discriminatory animus." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (internal citation omitted). In this case, Plaintiff has proffered no probative evidence to rebut Defendant's legitimate reasons for its actions. Therefore, Defendant is entitled to summary judgment.

b.  Plaintiff Cannot Establish a Claim for Breach of Contract.

In addition to his disability discrimination and failure to accommodate claims, Plaintiff also argues that AU breached the terms of the OMFS Resident Handbook when it failed to provide Plaintiff with notice, an investigation, and a hearing prior to terminating his residency. *Second Amended Complaint,* ¶¶ 43-47. Specifically, Plaintiff argues that there was a contractual promise made by AU through the OMFS Resident Handbook because it set forth a procedure for investigating and hearing alleged violations of the OMFS resident code of conduct. *Id.* at ¶¶ 33-38.  Plaintiff also argues that Defendant further breached the OMFS Resident Handbook Contract when it ignored the recommendation of the hearing subcommittee and instead opted to uphold Plaintiff's termination. *Id.* Plaintiff's claim for breach of contract fails because 1) Plaintiff was an employee of AU, and therefore no student Code of Conduct hearing was necessary before terminating his employment; 2) there was no contract, written or otherwise, between Plaintiff and AU; and 3) even assuming *arguendo* that Plaintiff can establish a contract with AU, no terms of the contract were breached.

i.  Plaintiff was an employee of AU, and therefore no student code of conduct hearing was necessary before terminating his employment.

In regards to his breach of contract claim, Plaintiff asserts that AU was required to give him a student Code of Conduct hearing prior to discharging him from the OMFS residency program. Contrary to Plaintiff's assertions, AU had no duty to conduct a student code of conduct hearing prior to terminating him because Plaintiff was an employee of AU. As such, he was held to the same disciplinary rules and processes as any other AU employee.

Both Federal and Georgia courts have repeatedly classified medical residents as employees.  In 2011, the United States Supreme Court ruled that, for tax purposes, medical residents are classified as employees of the school, not students. *See Mayo v. U.S.,* 562 U.S. 44 (2011).  In its decision, the Court found that residents "who work long hours, serve as highly skilled professionals, and typically share some or all of the terms of employment as career employees are the kind of workers that Congress intended to both contribute and benefit from the Social Security System." *Id*. at 60. In *Zaklama v. Mount Sinai Medical Center*, the Eleventh Circuit Court allowed a medical resident's Title VII claim, which can only be brought against an *employer* for discriminating against an *employee,* to go forward, without commenting on the employment status of the plaintiff. *Id.* at 842 F.2d 291 (11th Cir. 1988); *see also Latif v. Univ. of Tex. Sw. Med. Ctr.*, 834 F. Supp. 2d 518 (N.D. Tex. 2011) (holding that medical residents are employees for the purpose of suit under Title VII).  Moreover, the Georgia Court of Appeals has

held that resident physicians are entitled to qualified immunity because they qualify as state employees under the Georgia Tort Claims Act. *Nelson v. Bd. of Regents of the Univ. Sys. of Ga.*, 307 Ga. App. 220 (2010).

Here, Plaintiff was an AU employee, and as such, no student Code of Conduct hearing was required prior to dismissing him from employment. (Arnold Aff., ¶ 4; Hightower Aff., Ex. 2). Debra Arnold, as the AU Director of Employee Relations, testified that all medical and dental residents are classified as employees by AU. (Arnold Aff., ¶4).  Plaintiff was paid a salary by AU, wherein FICA and other payroll and employment taxes were taken out of his paycheck; he also received employee benefits. (Arnold Aff., ¶ 11; Stevens Aff., ¶ 12). At no point was Plaintiff, who already possessed a Doctor of Dental Sciences ("D.D.S.") educational degree, required to pay tuition or any other type of fee to train as a resident at AU. (Stevens Aff., ¶¶ 8, 12). Plaintiff was also insured through the DOAS liability insurance policy, which is solely available to State of Georgia employees. (Arnold Aff., 7).

Moreover, prior to beginning his residency at AU, Plaintiff was processed through the human resources department. (Arnold Aff., ¶¶ 5, 12). As part of his employment processing, Plaintiff acknowledged that he received a link to the AU employee handbook. (Arnold Aff., ¶ 12, 14, Ex. 3). Plaintiff also acknowledged that in participating and working towards his completion of the OMFS program, he

was an AU employee, and as such, was "held to the same disciplinary rules and processes as all other employees." (Ferguson Aff., ¶¶ 7-8, Ex. 2, p. 9). All of these undisputed facts show that Plaintiff held the status of employee when he was terminated.

To the extent that there was any expectation of Plaintiff's continued participation in the OMFS residency program, Plaintiff was placed on notice that his ability to matriculate through the educational component of the OMFS residency program was contingent on his ability to maintain employment with AU. (Stevens Aff., ¶ 6). Beginning on February 7, 2012, Plaintiff acknowledged that his acceptance into the OMFS program was contingent upon, among other things, his "meeting all [AU's] *employment,* departmental, and institutional requirements." (emphasis added). (Ferguson Aff., ¶¶ 5-6, Ex. 1). As discussed above, when he signed the Resident Expectations form in July of 2014, Plaintiff acknowledged that he was an AU employee, and as such, was "held to the same disciplinary rules and processes as all other employees." (Ferguson Aff., Ex. 2, p. 9).

Plaintiff was repeatedly put on notice and acknowledged in writing that his ability to complete the OMFS residency program and obtain any type of OMFS certificate was entirely contingent upon his ability to maintain employment with AU and that he was held to the exact same disciplinary standards as any other AU employee. Plaintiff has not shown that he was somehow exempt from AU's

23

employment policies, nor has Plaintiff shown that AU employees were entitled to any type of code of conduct hearing prior to termination.  Based on the foregoing, Plaintiff cannot show that AU had any contractual duty to conduct a student code of conduct investigation and hearing prior to terminating his employment.

ii.  <u>There was no contract, written or otherwise, between Plaintiff and AU.</u>

Plaintiff also has not and cannot show that there was any binding contract, written or otherwise, between the parties that required AU to conduct a student Code of Conduct hearing prior to discharging Plaintiff from the OMFS residency program.

Under Georgia law, "[t]he party asserting the existence of a contract has the burden of proving its existence and its terms." *Donahue v. Green*, 209 Ga. App. 381, 382 (1993). The enforceability of a contract is determined by whether its terms are expressed in plain and explicit language so as to convey what was agreed upon by the parties. *Dibrell Bros. Int'l S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1582 (11th Cir. 1994).  No contract is formed without certainty regarding the terms of the subject matter, "consideration, and mutual assent." *Lamb v. Decatur Fed. Sav. & Loan Assoc.*, 201 Ga. App. 583, 411 S.E.2d 527, 529 (1991); *see also* O.C.G.A. § 13-3-1. A contract is formed only when there is a meeting of the minds.  *Oldham v. Self*, 279 Ga. App. 703, 707 (2006). "As a

general rule, one not in privity of contract with another cannot maintain an action against him for breach of the contract." *Walls, Inc. v. Atlantic Realty Co.,* 186 Ga. App. 389, 391 (1988).

Here, Plaintiff faces an even higher bar of showing that there a written contract between the parties because the State has only waived its sovereign immunity for breaches of *written* contracts. .  O.C.G.A. § 50-21-1 ("[S]overeign immunity is waived as to any action ex contractu for the breach of any written contract . . . entered into by the state ….").   The OMFS Resident Handbook is not an express, written agreement capable of waiving Defendant's sovereign immunity because it is not a signed contract between Plaintiff and AU.  In *Bd. of Regents of the Univ. Sys. of Ga. v. Barnes*, a student at Valdosta State University, who was withdrawn from school due to being a clear and present danger, brought suit against the university, alleging that the policies and provisions in the university's student handbook setting forth the student disciplinary procedures and the contracts for student housing established a binding agreement between himself and the Board of Regents. *Id*. at 322 Ga. App. 47 (2013). The court found that there was no binding contract between the parties, because the university handbook was not signed by either party, and as such, there was no contemporaneous agreement between the parties demonstrating their intent to enter into a binding contract. *Id.* at 50; *see also Bd. of Regents of the Univ. Sys. Of Georgia v. Tyson*, 261 Ga. 368,

369-70 (1991)(a group of hospital documents, including a consent to care document signed by a patient, did not include any signed writing which would establish the essential terms of a contract); *Bd. of Regents of the Univ. Sys. of Georgia v. Ruff*, 315 Ga. App. 452, 456-57 (2012) (a group of documents for a study abroad program, none of which were signed by a representative of the Board of Regents, did not establish the terms of a written contract); *Kennedy v. Georgia Dep't of Human Res. Child Support Enforcement*, 286 Ga. App. 222, 224 (2007)(even though the appellee had signed a Statement of Understanding and the document was referred to as a "contract," the document did not have a signature line for the Department to sign and date, and therefore, the terms of the document were too uncertain to form a binding, legal contract).

Although Plaintiff may assert that the Resident Expectations Memorandum that he and Dr. Ferguson both signed in July of 2014 constitutes a valid written contract that incorporated the Code of Conduct, this is a meritless argument because at the time that Plaintiff and Dr. Ferguson signed the Residents Expectations Memorandum, it was a standalone document that was not part of the OMFS Resident Handbook. (Ferguson Aff., ¶ 9; Hanes Aff., Ex. 1., pp. 102-114). A different version of the document was later incorporated into the OMFS Resident Handbook, however, Plaintiff never signed the version of the Resident Expectations Memorandum that was incorporated into the OMFS Resident

Handbook. *Id.*   Thus, the Resident Expectations Memorandum and the OMFS

Resident Handbook are not signed, contemporaneous writings and do not

demonstrate that Plaintiff and AU entered into a binding contract that required both

parties to strictly adhere to all terms and provisions of the Resident Handbook.

Based on the foregoing, Plaintiff cannot show the existence of an express, written

contract capable of waiving AU's sovereign immunity. Accordingly, Plaintiff's

claim for breach of contract fails.

        iii.  <u>Even assuming Plaintiff had a contract with AU, no</u>
<u>terms of the contract were breached.</u>

Even assuming *arguendo* that Plaintiff can show that he and AU were

parties to a contact that was formed through the OMFS Resident Handbook, no

terms of this contract were breached. AU conducted a full Code of Conduct

investigation and hearing for Plaintiff as it related to the May 17, 2016 incident

with Dr. Ferguson. (Hightower Aff., ¶¶ 8-10, Ex. 2; Lefebvre Aff., ¶ 48;  Ferguson

Aff., ¶¶ 47-48, Ex. 40; Hanes Aff., ¶¶ 24-30, Ex. 6-10). After AU's legal services

department received a letter on Plaintiff's behalf alleging that Plaintiff did not

receive a student Code of Conduct hearing for the May 17, 2016 incident, the

DCG, out of an abundance of caution, gave Plaintiff a formal student Code of

Conduct hearing as delineated in the OMFS Resident Handbook. (Hightower Aff.,

¶¶ 6-10, Ex. 1-2; Lefebvre Aff., ¶ 48;  Ferguson Aff., ¶¶ 47-48, Ex. 40; Hanes Aff.,

¶¶ 24-30, Ex. 6-10).

Prior to the July 26, 2015 Code of Conduct hearing date, Plaintiff was

advised of the evidence that would be presented against him as well as his rights at

the hearing. (Hanes Aff., ¶¶ 24-30, Ex. 6-10).  During the hearing, which lasted

over four hours, Plaintiff was present, questioned witnesses, and presented his

defense to the allegations. (Lefebvre Aff., ¶49, Ex. 21; Ferguson Aff., ¶ 49).

The hearing subcommittee found that Plaintiff was guilty and recommended

that he receive "administrative probation with restrictions." Pursuant to the Code

of Conduct, Dr. Lefebvre was the final decision maker with regard to disciplinary

decisions and had the power to revise the subcommittee's punishment

recommendation. Dr. Lefebvre found that based on Plaintiff's violation of his April

22, 2016 employee disciplinary final warning letter, expulsion from DCG and the

OMFS program was proper. (Lefebvre Aff., ¶¶ 4, 49-50, Ex. 21-22; Hanes Aff.,

Ex. 1, pp. 89-91). The President of AU later affirmed Dr. Lefebvre's decision

when Plaintiff appealed his dismissal. (Lefebvre Aff., ¶ 51, Ex. 23).  Based on

these facts, it is clear that AU followed all policies that were delineated by the

OMFS Resident Handbook for Code of Conduct violations.

To the extent Plaintiff argues that the OMFS Resident Handbook contract

was breached because the hearing was completed after his termination, this

argument lacks merit.  Although there were timelines laid out for handling Code of Conduct complaints, these were merely guidelines, not requirements. (Hanes Aff., ¶ 8).  As long as reasonable efforts were made to meet the stated timeframes, there was not a penalty if the timelines were not met. *Id.* Once Plaintiff voiced his concerns about having a Code of Conduct hearing on June 13, 2016, AU swiftly complied with the procedures set forth in the Resident Handbook and gave Plaintiff a hearing within six weeks. (Hanes Aff., ¶¶ 24-30, Ex. 6-10; Lefebvre Aff., ¶49, Ex. 21; Ferguson Aff., ¶ 49).

Moreover, Plaintiff was still provided with notice, an investigation, and an opportunity to be heard *prior to* his termination and expulsion, and therefore, he cannot establish that any terms of the alleged contract between himself and AU were breached. *See Second Amended Complaint,* ¶¶ 43-47.  Immediately following the incident between Plaintiff and Dr. Ferguson on May 17, 2016, Plaintiff was suspended from service until further notice and Arnold and Rush quickly began conducting an independent investigation into what transpired that day. (Stevens Aff., ¶¶ 44-45; Lefebvre Aff., ¶ 43; Arnold Aff., ¶¶ 26-28; Rush Aff., ¶¶ 15-17). During this investigation, not only were Dr. Ferguson and numerous other eyewitnesses questioned about the incident, but Plaintiff himself was questioned and given an opportunity to explain his side of the story. (Arnold Aff., ¶¶ 26-27, Ex. 8; Rush Aff., ¶¶ 15, 17, Ex. 8; Ferguson Aff., ¶ 46; Stevens Aff., ¶ 46;

Lefebvre Aff., ¶ 44). It was not until after this independent investigation was completed and a detailed report by Rush and Arnold was issued on May 27, 2016, that a group decision was made to terminate Plaintiff's employment. (Arnold Aff., ¶¶ 27-30, Ex. 8; Rush Aff., ¶18, Ex. 8; Stevens Aff., ¶ 46; Hightower Aff., ¶ 4; Lefebvre Aff., ¶ 46; Hanes Aff., ¶ 23). Thus, Plaintiff was provided with notice of the possible violation, an independent investigation into the incident, and an opportunity to be heard *prior* to any expulsion or termination decision being made by AU.

To the extent that Plaintiff also asserts that AU breached the OMFS Resident Handbook contract by acting in bad faith when Dr. Lefebvre amended the recommendations of the Code of Conduct hearing subcommittee to expel Plaintiff instead of merely disciplining him with administrative probation with restrictions, this argument also fails. Dr. Lefebvre was the final decision maker with regard to disciplinary decisions in the DCG, and was expressly permitted by the plain language of the Code of Conduct to amend the recommendations of the Code of Conduct. (Lefebvre Aff., ¶ 4; Hanes Aff., Ex. 1, pp. 89-91).  Dr. Lefebvre was not required to follow any recommendation that the Hearing Subcommittee gave her. (Lefebvre Aff., ¶ 4).

Moreover, any actions that Dr. Lefebvre took as it related to expelling Plaintiff offer no claim of relief because "it is well settled that disputes concerning

academic decisions made by public institutions of learning present no justiciable controversy." *Bd. of Regents of the Univ. Sys. of Ga. v. Houston*, 282 Ga. App. 412, 414 (2006). "Courts are ill-equipped to make such fundamental legislative and administrative policy decisions . . . as [to] the myriad of the matters involved in the everyday administration of a public school system which the courts would face were they to embark upon the course of judicial activism desired by the school patrons." *Woodruff v. Georgia State University*, 251 Ga. 232, 233 (1983). "Absent plain necessity impelled by a deprivation of major proportion, the hand of the judicial branch alike must be withheld." *Blaine v. Savannah Country Day School*, 228 Ga. App. 224 (1997) (Court refused to reverse a school's permanent expulsion of a student who had been found guilty of an honor code violation); *see also* Ga. Const. Art. VIII, Sec. V, Par. II. Here, if Plaintiff asserts that he was a resident student and therefore the university was bound to the terms OMFS Resident Code of Conduct in disciplining him, any decisions made by Dr. Lefebvre as it related to his discipline under the Code of Conduct is a non-justiciable issue for this Court. Based on these facts, Plaintiff cannot show that AU breached any contract that it had with Plaintiff.

c. <u>Plaintiff was provided due process.</u>

Lastly, Plaintiff asserts that AU violated his procedural due process under the Fourteenth Amendment because it failed to provide him with notice and a

hearing before terminating his residency in the OMFS program. *Second Amended Complaint,* ¶¶48-52.  As a preliminary matter, any due process claim that Plaintiff makes as it relates to AU must be dismissed, because AU is not subject to suit under Section 1983. *Will v. Michigan State Dept. of Police*, 491 U.S. 58, 65 (1989). The statutory language of 42 U.S.C. § 1983 proscribes certain actions by a "person" or "persons" which violate the rights of others.  The Supreme Court has ruled that "person" in this context is to be given its ordinary meaning, and that "a State is not a person within the meaning of Section 1983."  *Will*, 491 U.S. at 65 (1989).  A "State" includes State agencies and local government entities that are considered "arms of the State."  *Id*. at 70.  The Board of Regents is an agency of the State of Georgia, and AU is a unit of the Board of Regents. *Wilson v. Bd. of Regents*, 262 Ga. 413, 414 (1992); Ga. Const. Art. VIII, Section IV, Paragraph I; As a unit of the Board of Regents, AU is not a "person" within the meaning of Section 1983, and therefore any Section 1983 claim against it must be dismissed.

Notwithstanding this, Plaintiff cannot show that AU failed to provide him due process by failing to provide him with a Code of Conduct hearing prior to his termination. Giving Plaintiff a Code of Conduct hearing, even after his termination, was sufficient, because AU provided an adequate post-termination remedy to Plaintiff. *See Maxwell v. Mayor & Alderman*, 226 Ga. App. 705 (1997) (A procedural due process violation is not complete unless and until the State fails

to provide due process. The state may cure a procedural deprivation by providing a later procedural remedy); *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (A plaintiff cannot allege a viable due process claim for either a negligent or intentional deprivation of a personal property interest by State actors so long as the State provides a meaningful post-deprivation remedy). Here, any due-process right that Plaintiff had in regards to a hearing prior to his dismissal from the educational component of the OMFS residency was met when AU gave him his Code of Conduct hearing on July 26, 2016. Furthermore, for the reasons discussed above in section IV(b)(iii), Plaintiff was given notice and a hearing prior to his residency being terminated. As such, Plaintiff's due process claim fails and AU is entitled to summary judgment.

## V.   <u>CONCLUSION.</u>

For the reasons explained herein, Defendant respectfully requests that the Court grant Defendant's motion for summary judgment on all of Plaintiff's claims.

Respectfully submitted, this 17th day of September, 2018.

CHRISTOPHER M. CARR        112505
Attorney General

ANNETTE M. COWART          191199
Deputy Attorney General

*/s/ Bryan K. Webb*
BRYAN K. WEBB              743580
Senior Assistant Attorney General

*/s/ Mary Catherine Greaber*
MARY CATHERINE GREABER       441858
Assistant Attorney General

Please address all communications to:
Mary Catherine Greaber
Assistant Attorney General
40 Capital Square SW
Atlanta, Georgia 30334-1300
Telephone: (404) 656-5331
Fax: (404) 657-9932
Email: mgreaber@law.ga.gov

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this 17th day of September, 2018, caused to be served upon the Plaintiff the within and foregoing **BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** to be filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

> Regan Keebaugh
> regan@decaturlegal.com
>
> James Radford
> james@decaturlegal.com

> <u>*s/ Mary Catherine Greaber*</u>
> Mary Catherine Greaber
> Assistant Attorney General
> Department of Law, State of Georgia
> 40 Capital Square, S.W.
> Atlanta, Georgia 30334-1300
> Telephone: (404) 656-5331
> Fax: (404) 657-9932
> Email: <u>mgreaber@law.ga.gov</u>