# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF GEORGIA
### AUGUSTA DIVISION

BILLY B. LAUN II, D.D.S.,　　　*
　　　　　　　　　　　　　　　*
　　　Plaintiff,　　　　　　　*
　　　　　　　　　　　　　　　*
　　　v.　　　　　　　　　　　*　　　　CV 118-033
　　　　　　　　　　　　　　　*
THE BOARD OF REGENTS OF THE　*
UNIVERSITY SYSTEM OF GEORGIA　*
d/b/a/ AUGUSTA UNIVERSITY,　　*
　　　　　　　　　　　　　　　*
　　　Defendant.　　　　　　　*

-----

**O R D E R**

-----

Before the Court is Defendant Board of Regents of the

University System of Georgia d/b/a Augusta University's[1]

("Defendant") motion for summary judgment. (Doc. 21.) The Clerk

of Court gave Plaintiff Billy B. Laun II, D.D.S. ("Plaintiff")

-----

[1] Although Plaintiff brings this suit against Augusta University as a separate defendant from the Board of Regents of the University System of Georgia ("BOR"), Augusta university exists and operates solely as a unit of the BOR. See GA. CONST. art VIII, § 4, ¶ 1(b); O.C.G.A. §§ 20-3-31, 20-3-32; McCafferty v. Med. Coll. of Ga., 249 Ga. 62, 65 (1982), overruled on other grounds by Self v. City of Atlanta, 377 S.E.2d 674 (Ga. 1989) (holding that the Medical College of Georgia, as a unit of the BOR, is not a legal entity capable of being sued). Defendant addressed this issue in its motion for summary judgment (Mot. for Summ. J., Doc. 21, at 1 n.1; Br. Supp. Mot. for Summ. J., Doc. 21-1, at 1 n.1), but Plaintiff failed to respond (see generally Resp. to Mot. for Summ. J., Doc. 27). Plaintiff does, however, collectively refer to Augusta University and the BOR singularly as "Defendant." (Resp. to Mot. for Summ. J., at 1 (Plaintiff "raises claims arising from his expulsion from the Advanced Education Oral and Maxillofacial Surgery Residency ("OMFS") program operated by Defendant Augusta University . . . and the [BOR] . . . (collectively referred to as "Defendant").").) Because Augusta University is not a proper party, the Court **DISMISSES** Augusta University as a defendant under Federal Rule of Civil Procedure 21. The Court **DIRECTS** the Clerk to **TERMINATE** Augusta University as a party and **MODIFY** the remaining Defendant's title to be "Board of Regents of the University System of Georgia d/b/a Augusta University."

timely notice of Defendant's motion, the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 22.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam) have been satisfied. Plaintiff filed a response in opposition (Doc. 27), and Defendant filed a reply in support (Doc. 33). The time for filing materials in opposition has expired, and the motion is ripe for consideration. Upon review of the evidence of record, relevant law, and the Parties' respective briefs, Defendant's motion for summary judgment (Doc. 21) is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

Plaintiff's pending claims against Defendant are as follows: (1) disability discrimination claims under Titles I and II of the Americans with Disabilities Act, 42 U.S.C § 12101, *et seq.* ("ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* and (2) a breach of contract claim.[2] The Court provides below the facts directly relevant to Plaintiff's disability discrimination and breach of contract claims.

---

[2] Plaintiff also has a claim that Defendant violated Plaintiff's procedural due process rights under 42 U.S.C. § 1983 and the Fourteenth Amendment. Plaintiff, however, has abandoned this claim. (Resp. to Mot. for Summ. J., at 1 n.1 ("[Plaintiff's] amended complaint also includes a procedural due process claim. Based on information developed through discovery, [Plaintiff] has elected to abandon this claim.").) Therefore, the Court **GRANTS** Defendant's motion for summary judgment as to Plaintiff's procedural due process claim.

Beginning on July 1, 2012, Plaintiff was a resident in the Advanced Education Oral and Maxillofacial Surgery ("OMFS") Residency Program ("Residency Program") at the Dental College of Georgia at Augusta University ("Dental College"). (Pl.'s Resp. to St. Mat. Facts,[3] Doc. 28, ¶ 1.) On June 2, 2016, Plaintiff was terminated from the Residency Program. (Id.)

As early as November of 2012, Dr. Henry Ferguson, D.M.D, professor and faculty member in the OMFS Department, and Dr. Mark Stevens, D.D.S., Chairman of the OMFS Department, began receiving complaints about Plaintiff from faculty members and employees. (Dr. Ferguson's Aff., Doc. 21-7, ¶¶ 2, 19; Dr. Stevens's Aff., Doc. 21-6, ¶¶ 2, 16.) Dr. Ferguson authenticated twenty-six communications from individuals complaining about Plaintiff's behavior spanning from November 1, 2012, to June 23, 2015. (Dr. Ferguson's Aff., ¶¶ 20-21; Doc. 21-7, Exs. 4-25.) The complaints concerned Plaintiff's "rude and insubordinate behavior" and "ability to safely care for and treat patients." (Dr. Ferguson's Aff., ¶¶ 20-21.) Dr. Ferguson also stated that "[i]n addition to the complaints I was informed of, I also had several personal encounters with [Plaintiff] where [he] acted in a rude, disobedient, or insubordinate manner." (Id. ¶ 22.)

---

[3] In this section, the Court cites Plaintiff's Response to Defendant's Statement of Material Facts only when Plaintiff does not dispute the facts alleged by Defendant, unless otherwise noted.

The complaints also included concerns about Plaintiff's clinical judgment. (See, e.g., Oct. 31, 2014 Email from Dr. Salgueiro, Doc. 21-7, Ex. 11, at 39[4] ("He is not aware of his limitations and lacks good clinical judgment. He is disrespectful, confrontational and unable to follow directions. He argues about every[] clinical decision and does not know when to stop. All th[ese] things make him unreliable and dangerous. I do not feel comfortable assuming the liability for the things he does in the clinic and I am very uncomfortable with him caring for hospital and major surgical cases.").)

Lastly, Plaintiff appeared to have issues following the proper procedure when leaving the clinic. Specifically, Dr. Stevens reported to Dr. Ferguson that "[o]n September 10th[,] [2014,] [Plaintiff] left the clinic for a case at the hospital on another service without getting permission from the director of training program or chairman. This was a dereliction of duty." (Oct. 14, 2014 Email from Dr. Stevens, Doc. 21-6, Ex. 27, at 55.)

It is unclear if the complaints and issues from 2012 through the end of 2014 prompted Dr. Ferguson or others to verbally counsel Plaintiff. (Compare Dr. Ferguson's Aff., ¶ 24, with Pl.'s Decl., Doc. 27-2, ¶ 96.) Beginning in March of 2015, however, Dr. Ferguson began reporting Plaintiff's alleged misconduct. On March

---

[4] For convenience and clarity, when the Court cites to exhibits attached to affidavits and declarations, the Court cites the PDF page numbers of the document rather than the page numbers on the exhibits.

13, 2015, Dr. Ferguson found that similar to the September 14, 2014 incident, Plaintiff participated in a surgical case with another department "without clearance from either an OM[F]S Chief Resident or attending faculty." (Mar. 13, 2015 Code of Conduct Violation Memo., Doc. 21-7, Ex. 31, at 70.) Dr. Ferguson reported the March 13, 2015 incident to Dr. Philip J. Hanes, D.D.S., M.S., Associate Dean for Advanced Education at the Dental College, as a Code of Conduct violation. (Id.; Dr. Hanes's Aff., Doc. 21-5, ¶¶ 1-2.)

On May 7, 2015, Plaintiff pled guilty to this charge as a first offense. (Mar. 16, 2016 Recommendation from Code of Conduct Hr'g, Doc. 21-4, Ex. 14, at 63.) In June of 2015, Plaintiff changed his plea to not guilty and, thereafter, a Code of Conduct Investigative Subcommittee was appointed to evaluate the evidence. (Id.) The Investigative Subcommittee found sufficient evidence that Plaintiff was guilty and recommended that a Code of Conduct hearing be convened. (Id.) A year after the incident, on March 14, 2016, a hearing was held. (Id. at 64.) Plaintiff failed to attend the hearing, was found guilty as charged, and was placed on Administrative Probation for the remainder of the Residency Program. (Id.)

During the year between Plaintiff being charged with his first Code of Conduct violation and the hearing for that violation, important events took place. On June 4, 2015, Plaintiff's co-

resident, Dr. Becky Paquin, complained to Dr. Stevens about an interaction she had with Plaintiff where she found Plaintiff to be aggressive. (Dr. Paquin's Letter to Dr. Stevens, Doc. 21-6, Ex. 28, at 56-58.) Dr. Paquin stated that Plaintiff repeatedly called her a "bitch," and she quoted Plaintiff as stating, "If I find out anyone is backstabbing me again, I am not afraid to go to jail." (Id. at 56.) In response, Dr. Stevens and Dr. Ferguson informed Plaintiff that his behavior was "highly unprofessional" and they were placing him on administrative leave for two weeks as a result. (June 5, 2015 Letter to Pl., Doc. 21-7, Ex. 34, at 75-76.) Then, on June 7, 2015, Dr. Ferguson filed a second Code of Conduct violation against Plaintiff, which prompted another subcommittee to investigate the June 4, 2015 complaint. (June 7, 2015 Code of Conduct Violation Memo., Doc. 21-7, Ex. 35, at 77.)

On July 2, 2015, the subcommittee reported that although there was "no reason to doubt Dr. Paquin's version of events, none of her specific allegations of unprofessional conduct between the two of them can be substantiated." (July 2, 2015 Subcommittee Report, Doc. 21-4, Ex. 6, at 39.) Therefore, the subcommittee found "insufficient grounds to further pursue these accusations of unprofessional conduct." (Id. at 40.) Despite this, the subcommittee noted concerns with Plaintiff, specifically the number of individuals who expressed apprehensions with Plaintiff's "recalcitran[t] [personality], unconventional perspectives, and

unwillingness to comply with routine and reasonable requests in a non-confrontational manner." (Id.) Furthermore, the subcommittee noted that "more than one respondent . . . suggested that [Plaintiff] has unconventional practice philosophies and pushes the limits of what might be considered prudent, particularly with sedation." (Id.) Lastly, the subcommittee confidentially reported "[t]he speculative reports that several individuals were fearful that [Plaintiff] could experience a personal breakdown in rational thought and proceed to violence (firearms)." (Id. at 41.)

On July 26, 2015, a meeting was held between Plaintiff and Dr. Carol Lefebvre, D.D.S., M.S., Dean of the Dental College; Dr. Ferguson; Dr. Hanes; Debra Arnold, Director of Employee Relations in the Human Resources Division at Augusta University; and James Rush, J.D., Chief Integrity Officer for Augusta University and other affiliated organizations. (Pl.'s Resp. to St. Mat. Facts, ¶ 53; Dr. Lefebvre's Aff., Doc. 21-4, ¶¶ 1-2; Ms. Arnold's Aff., Doc. 21-8, ¶¶ 2-3; Mr. Rush's Aff., Doc. 21-11, ¶¶ 2-3.) At the meeting, Plaintiff was informed he would be "placed on administrative leave until he completed a fitness for duty evaluation." (Pl.'s Resp. to St. Mat. Facts, ¶ 53.) "In August of 2015, Plaintiff underwent evaluations through Vanderbilt University's Comprehensive Assessment Program ('VCAP')." (Id. ¶ 55.) After evaluation, VCAP informed Mr. Rush — Plaintiff's

sole point of contact during this time — that Plaintiff was unfit for duty and further treatment was recommended. (Id. ¶ 56.)

Over the next few months, Plaintiff completed follow-up treatment at the Professional Renewal Center ("PRC") in Kansas. (Pl.'s Resp. to St. Mat. Facts, ¶ 57.) At the end of his time at the PRC, the PRC provided two reports: a "Fitness for Duty/Facility Summary" (PRC Fitness for Duty Report, Doc. 27-2, Ex. 4, at 31–35) and a "Treatment Report" (PRC Treatment Report, Doc. 27-2, Ex. 5, at 39–51) (collectively, "PRC Reports"). The PRC Reports are discussed in further detail below relating to Plaintiff's failure to accommodate claim. In general, however, the PRC Reports found that as long as Plaintiff complied with certain recommendations, he was fit to return to duty. (PRC Fitness for Duty Report, at 32 ("With his aftercare plan fully in place, his full compliance with all elements of that plan, and his continued commitment to skill maintenance and development, we see no impediment to his return to residency.").)

Prior to his return to the Residency Program, Dr. Lefebvre sent Plaintiff a letter explaining her expectations of Plaintiff upon his return and stating that if Plaintiff failed to meet those expectations, he would be immediately terminated. (Nov. 11, 2015 Letter from Dr. Lefebvre, Doc. 21-4, Ex. 11, at 54–55.) On December 14, 2015, Dr. Stevens and Mr. Rush met with Plaintiff to discuss their expectations of Plaintiff upon his return to the

8

Residency Program. (Pl.'s Resp. to St. Mat. Facts, ¶ 66.) They informed Plaintiff he was being placed on a six-week assessment and probationary period. (Id.)

Before returning to the Residency Program, Plaintiff filed an EEO complaint with Glenn Powell, Director of the Office of Employment Equity at Augusta University, alleging he was discriminated against for being "perceived as" having a disability. (Dec. 1, 2015 EEO Compl., Doc. 21-10, Ex. 2, at 18-20; Mr. Powell's Aff., Doc. 21-10, ¶¶ 1-2.) Mr. Powell's preliminary investigation found no evidence to support Plaintiff's allegations of disability discrimination because the reasons Plaintiff believed he was treated negatively were unrelated to Plaintiff being perceived as having a disability. (Pl.'s Resp. to St. Mat. Facts, ¶ 65; Mr. Powell's Preliminary Report, Doc. 21-10, Ex. 4, at 34-35.)

Plaintiff then returned to the Residency Program. Following the conclusion of Plaintiff's assessment and probationary period, Dr. Stevens provided Plaintiff with the faculty's evaluation of Plaintiff, which also included recommendations for improvement. (Feb. 12, 2016 Faculty Evaluation, Doc. 21-6, Ex. 29, at 59-63.) On February 19, 2016, Dr. Stevens provided Plaintiff with a second memorandum concerning expectations for Plaintiff's improvement, which Plaintiff tore up in front of Dr. Stevens. (Pl.'s Resp. to St. Mat. Facts, ¶¶ 67-72; see Picture of Shredded Memo., Doc. 21-

6, Ex. 30, at 65.)  Later, Plaintiff signed a copy of the February 19, 2016 memorandum with reservations.  (Feb. 19, 2016 Memo. from Dr. Stevens, Doc. 21-6, Ex. 31, at 68.)

Another incident occurred on March 1, 2016.  Denise Webster, Legal Services Coordinator in Augusta University's Legal Affairs Office, reported to Chris Melcher, Executive Vice President for Legal Affairs at Augusta University, an incident involving Plaintiff that occurred on March 1, 2016.  (Ms. Webster's Memo., Doc. 21-4, Ex. 13, at 61-62.)  In sum, Ms. Webster stated that Plaintiff called the Legal Affairs Office to speak with an attorney because "[Mr.] Rush was not being responsive enough to him."  (Id. at 61.)  Ms. Webster informed Plaintiff that she was "instructed to tell [Plaintiff] that the only person on campus that he was allowed to speak with would be [Mr.] Rush."  (Id.)  Ms. Webster reported that Plaintiff then became aggressive towards her and threatened her with her job.  (Id. at 61-62.)  The interaction made Ms. Webster "uncomfortable about [Plaintiff] being on this campus" and fearful because she believed Plaintiff "unstable and [able to] do harm."  (Id. at 62.)  Mr. Melcher reported the incident to, among others, Dr. Lefebvre.  (Mar. 2, 2016 Email from Mr. Melcher, Doc. 21-4, Ex. 13, at 59-62.)

On March 3, 2016, Dr. Lefebvre placed Plaintiff on administrative leave.  (Pl.'s Resp. to St. Mat. Facts., ¶ 76.)  Ms. Arnold investigated the March 1, 2016 incident.  (Id. ¶ 77.)

Ms. Arnold found that Plaintiff "violated [W]ork [R]ule #18[:] Threatening, engaging in threatening behavior (physical/verbal), or fighting in the workplace towards a co-worker, supervisor, patient, or any individual within the institution or enterprise." (Apr. 11, 2016 Report by Ms. Arnold, Doc. 21-8, Ex. 5, at 44–45.)

On April 20, 2016, Dawn Gantt, Dr. Lefebvre's assistant, reported another incident involving Plaintiff. (Apr. 20, 2016 Memo. from Ms. Gantt, Doc. 21-8, Ex. 6, at 47.) Plaintiff came to Dr. Lefebvre's office to complain that he was not "getting cases the way other Residents [were]." (Id.) Plaintiff became angry and Dr. Lefebvre asked Plaintiff to leave or she would call public safety. (Id. at 47–48.) After Ms. Gantt asked Plaintiff to leave around five times, he finally left to speak with Dr. Kevin B. Frazier. (Id. at 48.)

On April 22, 2016, Dr. Stevens issued Plaintiff a final warning letter ("Final Warning") based on the March 1, 2016 violation of Work Rule #18 and Plaintiff's continued behavioral issues. (Final Warning, Doc. 21-6, Ex. 37, at 81–83, 85.) The Final Warning specified that "any further violations of [Augusta University] work rules, OM[F]S department guidelines, or your [i]mprovement plan will result in discharge from the OM[F]S residency program and Augusta University. Should another event occur, you will be immediately suspended, an investigation will be

conducted and the final outcome will determine your status." (Id. at 85.)

The final incident occurred on May 17, 2016, when Plaintiff was supposed to be at the clinic. (Pl.'s Resp. to St. Mat. Facts, ¶ 88.) Staff could not locate Plaintiff, so they paged him. (Id.) Instead of returning directly to the clinic after receiving the page, Plaintiff went to Dr. Ferguson's office and a verbal altercation ensued with Plaintiff raising past issues and Dr. Ferguson asking Plaintiff to leave his office multiple times. (Id. ¶¶ 89-91; May 27, 2016 Report by Ms. Arnold & Mr. Rush, Doc. 21-8, Ex. 8, at 54-56.) Plaintiff left Dr. Ferguson's office but returned after clinic and began another verbal exchange. (Pl.'s Resp. to St. Mat. Facts, ¶ 91.)

Ms. Arnold and Mr. Rush investigated the May 17, 2016 events. (May 27, 2016 Report by Ms. Arnold & Mr. Rush, at 54-56.) Ms. Arnold and Mr. Rush reported that on May 17, 2016, Plaintiff "violated the expectations set forth in his [F]inal [W]arning and therefore the department [would] need to determine the action to be taken." (Id. at 56.)

Dr. Lefebvre, Dr. Hanes, Dr. Stevens, and Dr. Ferguson, with input from Mr. Rush, Ms. Arnold, and Anthony Hightower, decided termination was the proper action. (Pl.'s Resp. to St. Mat. Facts, ¶ 95.) On June 2, 2016, Dr. Stevens presented Plaintiff with a letter notifying him of his termination ("Termination Notice").

12

(Id. ¶ 96; Termination Notice, Doc. 21-8, Ex. 9, at 57–58.) The Termination Notice stated that Plaintiff was terminated, effective immediately, for violating "Work Rule #4: Rude or discourteous behavior toward patients or other persons at Augusta University" and "Work Rule #13: Insubordination or willful disobedience." (Termination Notice, at 57.)

After termination, Plaintiff's counsel sent Defendant a letter stating that Defendant made a promise in the Code of Conduct section of the Resident Handbook to "conduct an investigation and allow the accused resident to participate in a formal hearing to address allegations against him," yet Defendant failed to follow those procedures. (June 13, 2016 Letter from Pl.'s Counsel, Doc. 27-2, Ex. 6, at 55.) Thereafter, Defendant provided Plaintiff with an investigation and a hearing held on July 26, 2016. (Pl.'s Resp. to St. Mat. Facts, ¶¶ 100, 105.) The hearing subcommittee determined that Plaintiff was guilty and recommended he receive "Administrative Probation with Restrictions." (July 27, 2016 Recommendation from Code of Conduct Hr'g, Doc. 21-4, Ex. 21, at 95.) Plaintiff's termination was ultimately upheld on August 1, 2016, by Dr. Lefebvre, and on August 12, 2016, by Brooks Keel, Augusta University's President. (Aug. 1, 2016 Letter Upholding Termination, Doc. 21-4, Ex. 22, at 98–99; Aug. 12, 2016 Letter Upholding Termination, Doc. 21-4, Ex. 23, at 100.)

Post-termination, Plaintiff filed a new disability discrimination complaint where he claimed he was discriminated against and not provided the reasonable accommodation of mediation prior to termination. (Pl.'s Discrimination Compl. and Request for Mediation, Doc. 21-10, Ex. 5, at 36-38.) Mr. Powell reviewed Plaintiff's discrimination complaint and request for mediation and, by letter dated July 25, 2016, found that mediation was not a reasonable accommodation because "[m]ediation is [v]oluntary"; "[b]oth Parties must agree on the outcome"; and "[m]ediation is not the proper venue to address serious, formal employment actions." (July 25, 2016 Letter from Mr. Powell, Doc. 21-10, Ex. 6, at 58-59.)

Plaintiff then filed a case in the Superior Court of Richmond County on May 18, 2016, and amended the complaint for the first time on September 19, 2016. (See Docs. 1-13, 1-18.) Plaintiff states he received his Notice of Right to Sue from the U.S. Equal Employment Opportunity Commission, and on January 22, 2018, amended the complaint for the second time adding claims of employment discrimination. (See Second Am. Compl., Doc. 1-3, at 1.) On February 21, 2019, Defendant removed the case to the Augusta Division of the U.S. District Court for the Southern District of Georgia. (See Notice of Removal, Doc. 1.)

## II. LEGAL STANDARDS

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The purpose of the summary judgment rule is to dispose of unsupported claims or defenses, which, as a matter of law, raise no genuine issues of material fact suitable for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322—24 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. Id. at 252; accord Gilliard v. Ga. Dep't of Corrs., 500 F. App'x 860, 863 (11th Cir. 2012) (per curiam).

As required, this Court will view the record evidence "in the light most favorable to the [nonmovant]," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will "draw all justifiable inferences in [Plaintiff's] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal quotation marks omitted). Additionally, the party opposing summary judgment "may not rest upon the mere

allegations or denials in its pleadings. Rather, its responses . . . must set forth specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576–77 (11th Cir. 1990).

### III. DISCUSSION

The Court now addresses Defendant's arguments that summary judgment is appropriate for Plaintiff's (A) disability discrimination claims and (B) breach of contract claim.

### A. Disability Discrimination

Plaintiff brings claims under the Rehabilitation Act and ADA. Both Acts prohibit employers from discriminating against an otherwise qualified individual with a disability. 42 U.S.C. § 12112(a); 29 U.S.C. § 794(a). "The standard for determining liability under the Rehabilitation Act is the same as that under the [ADA] . . . ; thus, cases involving the ADA are precedent for those involving the Rehabilitation Act." Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005) (internal citation omitted). The Court analyzes Plaintiff's Rehabilitation Act and ADA claims in conjunction.

For Plaintiff to establish a prima facie case of discrimination under the Rehabilitation Act, he must show: "(1) []he had a disability; (2) []he was otherwise qualified for the position; and (3) []he was subjected to unlawful

16

discrimination as the result of h[is] disability." <u>Garrett v.</u> <u>Univ. of Ala. at Birmingham Bd. of Trs.</u>, 507 F.3d 1306, 1310 (11th Cir. 2007). Although Defendant does not concede a challenge to prongs one and two — that Plaintiff had a disability and was otherwise qualified — Defendant only raises a challenge as to the third prong. (Br. Supp. Mot. for Summ. J., at 5.) To establish the third prong, Plaintiff argues Defendant discriminated against him under the theories of (1) failure to accommodate and (2) disparate treatment. (Second Am. Compl., ¶¶ 58-59, 67-68, 76-77.)

### 1. Failure to Accommodate

Unlawful discrimination can occur when an employer "fails to provide a reasonable accommodation" to an otherwise qualified person "unless doing so would impose an undue hardship on the employer." <u>Boyle v. City of Pell City</u>, 866 F.3d 1280, 1289 (11th Cir. 2017). An accommodation is only reasonable if it enables an employee with a disability "to perform the essential functions" of a position or "to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(ii), (iii). The reasonableness of an accommodation depends upon the specific facts and circumstances of the case. See <u>Stewart v. Happy Herman's</u> <u>Cheshire Bridge, Inc.</u>, 117 F.3d 1278, 1285 (11th Cir. 1997).

17

An employer need not demonstrate undue hardship until an employee meets his "burden of identifying an accommodation and demonstrating that it is reasonable." Frazier-White v. Gee, 818 F.3d 1249, 1255 (11th Cir. 2016) (citing Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255-56 (11th Cir. 2001)). "Moreover, an employer's 'duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.'" Id. at 1255-56 (quoting Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363-64 (11th Cir. 1999)).

If it is unclear what sort of reasonable accommodation is appropriate, "an informal, interactive process with the disabled individual *may* be necessary." Webb v. Donley, 347 F. App'x 443, 446 (11th Cir. 2009) (citing 29 C.F.R. § 1630.2(o)(3)) (emphasis in original); accord Stewart, 117 F.3d at 1286-87. As provided in 29 C.F.R. § 1630.2(o)(3), the interactive process "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."

If the employer engages in an interactive process, the employer will not be liable for failing to accommodate the employee if there is a breakdown in the interactive process not due to the

employer or there is no reasonable way to accommodate the employee.[5] See Stewart, 117 F.3d at 1286-87.

In the Eleventh Circuit, at the summary judgment stage, courts do not reach the question of whether the employer engaged in the interactive process unless and until the employee shows he requested a reasonable accommodation. Spears v. Creel, 607 F. App'x 943, 948 (11th Cir. 2015) (per curiam).

> When a request is patently unreasonable, the employer has no duty to investigate it or begin the interactive process. [Willis v. Conopco, Inc., 108 F.3d 282, 285 (11th Cir. 1997)]; Spears . . . , 607 F. App'x [at] 948 . . . . The same is true if the request does not make a sufficiently specific demand. Gaston . . . , 167 F.3d [at] 1363.

Hargett v. Fla. Atl. Univ. Bd. of Trs., 219 F. Supp. 3d 1227, 1243 (S.D. Fla. 2016). Therefore, the initial burden is on Plaintiff to show he made a sufficient request for a reasonable accommodation. Only then will the burden shift to Defendant to show that it satisfied its requirements under the ADA by (1) providing a reasonable accommodation or (2) by engaging with Plaintiff in an interactive process to determine a reasonable accommodation but no accommodation was provided because either (a) there was a breakdown in the process not due to Defendant or (b) there was no reasonable way to accommodate Plaintiff.[6]

---

[5] An employer can also satisfy its requirements by showing a reasonable accommodation would cause an undue hardship. Defendant, however, does not argue any potential accommodations would cause an undue hardship.

[6] Plaintiff cites the Third and Seventh Circuits to argue for application of a more lenient standard than what is required by the Eleventh Circuit. (Resp. to

Defendant argues that Plaintiff's claim for failure to accommodate fails as a matter of law because (a) Plaintiff failed to request a reasonable accommodation (Br. Supp. Mot. for Summ. J., at 7-9) and (b) even if Plaintiff requested an accommodation, Plaintiff was responsible for the breakdown in the interactive process (Reply Supp. Mot. for Summ. J., at 2-7). For the following reasons, the Court finds that there are genuine issues of material fact as to Plaintiff's failure to accommodate claim. Thus, the Court denies Defendant's motion for summary judgment as to this claim.

---

Mot. for Summ. J., at 10-13.) Plaintiff cites <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296 (3d Cir. 1999), to argue that the PRC Reports were sufficient to at least prompt Defendant to engage in the interactive process. In <u>Taylor</u>, an employee had a psychotic episode and was hospitalized for three weeks. 184 F.3d at 314. Her employer was aware of her episode and hospitalization. <u>Id.</u> The employee's son also informed the employer that his mom would need accommodations after returning to work and provided the employer with the means of obtaining further information. <u>Id.</u> Based on these facts, the Third Circuit found that the employer had a duty to engage in the interactive process to determine what specific accommodations the employee would need. <u>Id.</u> The Third Circuit quoted the Seventh Circuit in <u>Bultemeyer v. Fort Wayne Cmty. Schs.</u>, 100 F.3d 1281, 1285 (7th Cir. 1996), for the proposition that "[i]f the note from the psychiatrist requesting accommodation was too ambiguous and the employer did not know what [the employee] wanted, the employer easily could have called the psychiatrist for a clarification." <u>Taylor</u>, 184 F.3d at 314-15.

The Third Circuit, in <u>Taylor</u>, went further and stated that even if the court finds there was no feasible accommodation, the employer still had a duty to engage in the interactive process if only·to communicate to the employee that there was no feasible accommodation. <u>Id.</u> at 317. The reasoning in <u>Taylor</u> is inapplicable in the Eleventh Circuit, which requires an employee to show he requested a specific and reasonable accommodation before the court will require the employer to engage in the interactive process. <u>See, e.g.</u>, <u>Spears</u>, 607 F. App'x at 948. Even though Plaintiff's proffered standard is inapplicable, for reasons discussed below, the Court finds there is an issue of fact as to whether Plaintiff reaches the Eleventh Circuit standard.

*a. Request for a Reasonable Accommodation*

Plaintiff states he was diagnosed with PTSD while at the PRC. (Pl.'s St. Mat. Facts, Doc. 27-1, ¶ 61; Resp. to Mot. for Summ. J., at 11.) The Parties dispute who knew of Plaintiff's alleged diagnosis. Defendant states only Mr. Rush was aware of Plaintiff's disability because he served as Plaintiff's sole point of contact during the fitness for duty evaluation. (Def.'s St. Mat. Facts, Doc. 28, ¶ 58.) Plaintiff states that Dr. Lefebvre, Mr. Rush, and Ms. Arnold knew of his diagnosis because Plaintiff emailed them about his diagnosis. (Oct. 24, 2015 Email from Pl., Doc. 27-2, Ex. 3, at 29.) Plaintiff also states that he communicated his diagnosis to his faculty advisors, including Dr. Ferguson, and his co-residents. (Pl.'s Resp. to St. Mat. Facts, ¶ 58.)

According to Plaintiff, he requested a reasonable accommodation through the PRC Reports. Thus, the Court examines who saw the reports. Both Parties agree that Mr. Rush saw the PRC Reports. (PRC Fitness for Duty Report, at 31 ("[Plaintiff] has provided us with written authorization that permits us to disclose to [Mr. Rush] this letter.") Plaintiff also states, "Dr. Sato, who was responsible for ensuring Plaintiff followed Defendant's 'fitness for duty' requirements, received [the PRC Treatment Report], which described in detail [Plaintiff's] diagnoses, treatment history, and needs for further treatment." (Pl.'s Resp.

21

to St. Mat. Facts, ¶ 58; see Pl.'s Authorization to Exchange Information with Dr. Sato, Doc. 27-2, Ex. 5, at 38.) Following therefrom, Plaintiff argues that the PRC Reports placed Mr. Rush and Dr. Sato on notice of his disability and his need for a reasonable accommodation and, therefore, constituted an adequate request for a reasonable accommodation.

Although Plaintiff did not apply the correct standard in arguing he made a sufficient request for a reasonable accommodation, the Court examines the evidence to determine whether, in the light most favorable to Plaintiff, he requested accommodations and those requests were reasonable. To do so, the Court (i) explains that a request must be sufficiently specific and reasonable and (ii) examines Plaintiff's communications to Defendant.

            i. Request Must be Sufficiently Specific and
               Reasonable

An employee makes an adequate request for a reasonable accommodation when it is sufficiently specific and reasonable. Gaston, 167 F.3d at 1363-64; Willis, 108 F.3d at 284-85. For a request to be sufficiently specific, it does not have to employ any magic words, but the request must be definite enough that under the circumstances, the employer can be said to know of both the disability and desire for an accommodation. See Haines v. Cherokee Cty., No. 1:08—CV—2916—JOF/AJB, 2010 WL 2821853, at *21-22 (N.D.

Ga. Feb. 16, 2010), *R. & R. adopted as modified by* 2010 WL 2821780 (N.D. Ga. July 15, 2010) ("[I]f a plaintiff never requests a specific accommodation, []he cannot establish a failure to accommodate claim."). Further, the employee, or a third party, must actually communicate the request to the employer. Id. (finding that the employee failed to make an adequate request when the employer knew the employee had a disability and attended a counseling program).

The reasonableness of a requested accommodation is a fact-intensive inquiry. See Stewart, 117 F.3d at 1285. An accommodation is reasonable if it allows the employee to perform the job's essential functions. Lucas, 257 F.3d at 1255. The ADA provides that a reasonable accommodation may include, among other things, "job restructuring, part-time or modified work schedules, . . . appropriate adjustment or modifications of examinations, training materials or policies, . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).

### ii. Plaintiff's Communications to Defendant

The Court begins by quickly addressing Plaintiff's requests that cannot be considered requests for reasonable accommodations. The Court then generously construes the PRC Reports to determine if there exists a genuine issue of fact as to whether Plaintiff requested a reasonable accommodation.

23

## I. SUPPORTIVE AND STRUCTURED ENVIRONMENT

Plaintiff's request for a "supportive and structured environment" is unreasonable. (Resp. to Mot. for Summ. J., at 12-13.) General requests for a change in attitudes or environment are not specific enough. Posteraro v. RBS Citizens, N.A., 159 F. Supp. 3d 277, 290 (D.N.H. 2016) (finding a request for a "peaceful calm environment" too vague). Even if Plaintiff's request had been targeted to a specific person, he needed to identify specific stressors. See Hargett, 219 F. Supp. 3d at 1243-44 (finding that the employee's demand for her supervisor to "cease his hostile confrontations with her" was not specific enough because "[t]hat does not translate to a targeted demand relating to a 'specific stressor.'"); see also Gonzagowski v. Widnall, 115 F.3d 744, 747-48 (10th Cir. 1997) (Although "specific stressors in a work environment may in some cases be legitimate targets of accommodation, it is unreasonable to require an employer to create a work environment free or stress and criticism.").

## II. MODIFICATION IN DISCIPLINARY PROCEDURES

Similarly, Plaintiff's post-termination request for mediation in lieu of termination as an accommodation is unreasonable. "The ADA generally gives employers wide latitude to develop and enforce conduct rules. The only requirement imposed by the ADA is that a conduct rule be job-related and consistent with business necessity when it is applied to an employee whose disability caused [him] to

violate the rule." U.S. Equal Emp. Opportunity Comm'n, THE AMERICANS WITH DISABILITIES ACT: APPLYING PERFORMANCE AND CONDUCT STANDARDS TO EMPLOYEES WITH DISABILITIES (2017). Thus, requests for employers to alter disciplinary procedures are generally unreasonable. See Haines, 2010 WL 2821853, at *20 (quoting Hamilton v. Sw. Bell Tel. Co., 136 F.3d 1047, 1052 (5th Cir. 1998)) (stating the employer "did not need to provide any accommodation for [p]laintiff's unprofessional emails or other outbursts" [because] "the ADA does not insulate emotional or violent outbursts blamed on an impairment").

Additionally, as applied to this situation, Plaintiff's request for mediation was unreasonable. Even though Plaintiff had already been terminated when Defendant received Plaintiff's request for mediation as an accommodation, Mr. Powell responded to Plaintiff's request and found that mediation was not reasonable because Augusta University's mediation policy was voluntary; all parties must agree on the outcome; and mediation was not the proper venue to address serious employment actions, such as termination, which was covered by the University's formal grievance policies and procedures that Plaintiff had already exhausted. Plaintiff has the burden to show that the requested accommodation is reasonable and would allow him to perform the essential functions of his job. Plaintiff has not explained how, and the Court can find nothing establishing that, it would have been a reasonable

accommodation to engage in mediation after having already exhausted all the formal grievance policies and procedures.

### III. OTHER STATEMENTS COMMUNICATED TO DEFENDANT

The Court now generously construes all other statements made within the PRC Reports and finds that there are genuine issues of fact as to whether Plaintiff made a request for a reasonable accommodation. The PRC Reports contain recommendations, and Plaintiff agreed to comply with those recommendations in the PRC Fitness for Duty Report. (PRC Fitness for Duty Report, at 34-35 (Plaintiff signed the recommendations on November 18, 2015); PRC Treatment Report, at 49-51.) The recommendations contain the following agreements between Plaintiff and the PRC:

1. "[I]nitial contact with residents, attendings, and other staff as designated by Mr. Rush, will occur during meetings arranged by Mr. Rush."

2. Plaintiff agrees to "participate in individual therapy sessions with a psychotherapist who is agreeable to Mr. Rush."

3. Plaintiff "agree[s] to meet regularly with a workplace monitor, as approved by Mr. Rush."

4. Plaintiff acknowledges his "work schedule will need to allow for the opportunity to continue in [his] aftercare plan. This would include regularly scheduled appointments with [his] treaters, [his] mentor and [his] monitor."

(PRC Fitness for Duty Report, at 34-35; PRC Treatment Report, at 49-50.)

The actions impliedly agreed to by Mr. Rush and others appear sufficiently specific and reasonable. The actions are minor tasks, including modifying procedures and Plaintiff's work schedule. Plaintiff seemingly believed these changes would assist in his transition back to the Residency Program.

The Court agrees with Defendant that the PRC Reports are agreements between Plaintiff and the PRC to engage in certain behaviors. (Reply Supp. Mot. for Summ. J., at 4.) What is unclear, however, is whether the PRC Reports can be considered a request from Plaintiff to Defendant, specifically Mr. Rush. The record contains facts showing Plaintiff knew of and authorized for Mr. Rush and Dr. Sato to receive the reports and information within.

Clearly, there are at least implied actions that Mr. Rush and others agreed to take to ensure Plaintiff's smooth transition back to the Residency Program. It is unclear, however, whether Mr. Rush communicated to the PRC that he would take these actions and how Mr. Rush's name came to be in the reports at all. Construed in the light most favorable to Plaintiff, a factfinder could conclude that Mr. Rush agreed to take the actions cited within the PRC Reports to accommodate Plaintiff upon his return to the Residency Program. It could also be viewed that Plaintiff used

the PRC to send the reports as a way to convey Plaintiff's accommodation requests to Mr. Rush.

The Court notes the record contains evidence that Plaintiff also denied having a disability and believed he was required to undergo treatment for retaliatory reasons, which indicates that he did not intend the reports to be sent as a request for an accommodation. (See PRC Treatment Report, at 41 ("It should be noted that both Dr. Laun and his attorney asserted that the reason for the referral was retaliatory in nature and related to alleged insurance fraud, physical assault, and verbal threats from one of the attending faculty.").) However, the facts also show that Plaintiff informed others he had a disability. (See, e.g., Oct. 24, 2015 Email, at 29.) The Court, thus, believes there are genuine issues of material facts as to whether Plaintiff requested a reasonable accommodation.

### b. Engagement in the Interactive Process

Defendant failed to cite to information showing that, if the requests were adequate requests for a reasonable accommodation, Defendant reasonably accommodated Plaintiff. Thus, summary judgment for Defendant is only appropriate if, as argued by Defendant, it can show it engaged with Plaintiff in the interactive process and Plaintiff was responsible for the breakdown. The Court finds that there are insufficient facts in the record to show that Mr. Rush or others engaged with Plaintiff in the interactive

28

process and, if so, that Plaintiff was responsible for the breakdown in the process as a matter of law.

Defendant states that it attempted to engage informally in the interactive process with Plaintiff. (Reply Supp. Mot. for Summ. J., at 6-7.) In support of its position, Defendant states that prior to Plaintiff returning to the Residency Program, Dr. Lefebvre sent Plaintiff a letter explaining the "specific expectations for [Plaintiff's] return." (Nov. 11, 2015 Letter from Dr. Lefebvre, at 54-55.) Within the letter, Dr. Lefebvre stated that, among other things, Plaintiff would be under assessment and closely monitored, he "must participate in post-treatment activities as determined by the [PRC]," and Dr. Kevin Frazier would be Plaintiff's advocate upon his request. (Id.) Defendant states that Plaintiff failed to ask Dr. Frazier for assistance. (Reply Supp. Mot. for Summ. J., at 7.)

Defendant further states that Dr. Stevens and Mr. Rush met with Plaintiff on December 14, 2015, "to discuss the expectations of his return to the residency program, during which he was informed that he would be placed on a six[-]week assessment and probationary period." (Id. at 6.) Defendant cites two subsequent meetings between Dr. Stevens and Plaintiff. First, Dr. Stevens met with Plaintiff to provide him with a memorandum summarizing the faculty's evaluation of Plaintiff during his assessment period. (Id.; Feb. 12, 2016 Faculty Evaluation, at 59-63.)

Second, "[o]n February 19, 2016, Dr. Stevens . . . provided [Plaintiff] with another memorandum concerning the OMFS staff's expectations for Plaintiff's improvement and actions that Plaintiff needed to take to meet those expectations." (Reply Supp. Mot. for Summ. J., at 6.) Defendant argues that it attempted to engage in the interactive process with Plaintiff through "the letter from Dr. Lefebvre, Plaintiff's meetings with Dr. Stevens and [Mr.] Rush, and his probationary and assessment period." (Id. at 6-7.)

Conversely, Plaintiff argues that Defendant completely failed to engage in the interactive process with him. (Resp. to Mot. for Summ. J., at 13-16.) Specifically, Plaintiff states "Defendant never attempted to follow up with [Plaintiff] regarding the PRC's recommendations or otherwise explore any means to mitigate the impact of [Plaintiff]'s disability on his interpersonal and behavioral skills." (Id. at 15.)

Defendant provides evidence that individuals reached out to Plaintiff upon his return from the PRC. None of the conversations, however, appear to include discussions relating to the potential accommodation requests within the PRC Reports. First, Dr. Lefebvre's letter could not have been a response to the PRC Reports because Dr. Lefebvre's letter was sent before Plaintiff signed the recommendations and before the PRC Reports were sent to Mr. Rush and Dr. Sato. Second, although possible that Defendant engaged in

the interactive process through the meetings with Dr. Stevens and Mr. Rush and the probationary and assessment period, there is also evidence that these interactions were more disciplinary in nature; the point being to convey to Plaintiff Defendant's expectations without allowing for any discussion of what Plaintiff may have requested of Mr. Rush. Because there is a genuine question of whether Defendant engaged in the interactive process, summary judgment as to Plaintiff's failure to accommodate claim is inappropriate.[7]

### 2. Disparate Treatment

Plaintiff also brings a disparate treatment claim under the Rehabilitation Act and the ADA based on Plaintiff's discharge from the Residency Program. (Second Am. Compl., ¶¶ 58, 67, 76.) When there is no direct evidence of discrimination, a disparate treatment claim must be analyzed under the burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Under McDonnell Douglas, a plaintiff establishes a prima facie case of disability discrimination by showing "(1) he ha[d] a disability (2) he [was] otherwise qualified for the position; and (3) he was subjected to unlawful discrimination as the result of his disability." Sutton v. Lader,

---

[7] In its motion for summary judgment, Defendant presents no challenge as to whether Plaintiff was a qualified individual with a disability. The Court focuses on Defendant's challenges and makes no judgment as to whether Plaintiff was a qualified individual with a disability.

185 F.3d 1203, 1207 (11th Cir. 1999). Doing so creates a rebuttable presumption that the employer acted illegally. See McDonnell Douglas, 411 U.S. at 802. "The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the [termination]." Id. The employer's burden is an "exceedingly light" one of production, not persuasion, which means the employer "need only produce evidence that could allow a rational fact finder to conclude that [the plaintiff's] discharge was not made for a discriminatory reason." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1331 (11th Cir. 1998); Meeks v. Comput. Assocs. Int'l, 15 F.3d 1013, 1019 (11th Cir. 1994) (quoting Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1529 (11th Cir. 1992)). If the employer meets this burden, the burden shifts back to the plaintiff who can only avoid summary judgment by presenting "significantly probative" evidence that the proffered reasons are pretextual. Young v. Gen. Foods Corp., 840 F.2d 825, 829 (11th Cir. 1988).

*a. Prima Facie Case*

Without conceding the point, Defendant proceeds assuming *arguendo* that Plaintiff can establish a prima facie case of discrimination. (Br. Supp. Mot. for Summ. J., at 10.) The Court also proceeds assuming, without deciding, that Plaintiff has established a prima facie case of discrimination for his disparate treatment claim.

### b. Legitimate, Non-Discriminatory Reason

Defendant's proffered reason for terminating Plaintiff in June of 2016 was his "[r]ude or discourteous behavior" and his "[i]nsubordination or willful disobedience" in violation of Augusta University's work rules and the Final Warning. (Termination Notice, at 57.) Because Defendant's burden is only one of production, not proof, Defendant easily meets its burden. The burden now shifts back to Plaintiff to show pretext.

### c. Pretext

"An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) (emphasis omitted) (internal quotation marks omitted). Having proffered a non-discriminatory reason for terminating Plaintiff, to survive summary judgment, Plaintiff must show Defendant's reason was pretextual.[8]

To show pretext, a plaintiff must present "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action" by demonstrating "such weaknesses,

---

[8] Doing so would allow Plaintiff only to survive summary judgment and "thereby reach a jury on the ultimate question of discrimination. . . . [It] does not vitiate [Plaintiff's] ultimate burden to prove by a preponderance of the evidence that [Defendant] terminated [Plaintiff] based on a discriminatory motive." Damon, 196 F.3d at 1363 n.3.

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Cooper v. S. Co., 390 F.3d 695, 725 (11th Cir. 2004) (citation omitted), *overruled, in part, on other grounds by* Ash v. Tyson Foods, Inc., 546 U.S. 454 (2006); Combs v. Plantation Patterns, 106 F.3d 1519, 1529 (11th Cir. 1997). Evidence of intentional discrimination, not proof thereof, "is all a plaintiff needs to defeat a motion for summary judgment." Howard v. BP Oil Co., 32 F.3d 520, 525 (11th Cir. 1994). If "'the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason,' or showing that the decision was based on erroneous facts." Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec., 410 F. App'x 243, 247 (11th Cir. 2011) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)).

Evidence that the employer's reason is false may raise enough suspicion of pretext for the plaintiff to survive summary judgment.[9] The employer, however, "would be entitled to judgment

---

[9] The Eleventh Circuit has stated, "A reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." Brooks v. Cty. Comm'n of Jefferson Cty., 446 F.3d 1160, 1163 (11th Cir. 2006) (emphasis in original) (internal quotation marks omitted). The Court, however, also notes that the Supreme Court acknowledged that there may be instances where disbelieving the employer's proffered reason "together with the elements of the prima facie case, suffice to show intentional discrimination." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993); see

as a matter of law . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000). "Any believable evidence which demonstrates a genuine issue of fact regarding the truth of the employer's explanation may sustain the employee's burden of proof." Steger v. Gen. Elec. Co., 318 F.3d 1066, 1079 (11th Cir. 2003). As with all parties opposing summary judgment, Plaintiff must put forth more than a mere scintilla of evidence in support of his position. Anderson, 477 U.S. at 252.

The Court finds Plaintiff has not shown Defendant's reasons were pretextual. As detailed above, since the beginning of Plaintiff's time at the Residency Program, individuals complained about Plaintiff's rude and insubordinate behavior, ability to safely care for patients, and difficulty following procedures.

The following events occurred prior to Plaintiff's alleged PTSD diagnosis. In March of 2015, Dr. Ferguson reported Plaintiff for his first Code of Conduct violation based on the March 13, 2015 incident when Plaintiff left the clinic without permission. While the Investigative Subcommittee investigated the first

---

also Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1308-09 (11th Cir. 2012). Thus, showing that the employer's proffered reason is false may, sometimes, be sufficient to allow a reasonable juror to find intentional discrimination even without additional evidence that the employer's real reason was discriminatory.

violation, Dr. Ferguson reported Plaintiff for a second Code of Conduct violation based on Dr. Paquin's July 4, 2014 complaint about Plaintiff being aggressive towards her. The subcommittee investigating the second Code of Conduct violation reported many concerns about Plaintiff based on the number of individuals expressing apprehensions about him. Based on this report, Plaintiff was placed on administrative leave and sent to complete a fitness for duty evaluation. The evidence shows that the reason Plaintiff was sent to the VCAP was the number and seriousness of the complaints about Plaintiff.

Upon his return from the PRC — where Plaintiff states he was allegedly diagnosed with PTSD — Plaintiff was under evaluation and required to abide by certain expectations, yet individuals continued to file complaints about Plaintiff. These reported incidents culminated in Dr. Ferguson issuing Plaintiff the Final Warning. Ms. Arnold and Mr. Rush found that Plaintiff violated the Final Warning on May 17, 2016. As a result, Plaintiff was terminated.

Plaintiff attempts to show pretext, first, by arguing that Defendant "admits that [Plaintiff] was terminated for his behavioral symptoms that accompanied his mental condition." (Resp. to Mot. for Summ. J., at 16.) The flow of Plaintiff's logic appears to be that (1) Plaintiff has a disability that causes behavioral issues; (2) Defendant's proffered reason for

36

terminating him was, in part, Plaintiff's behavioral issues; and (3) because Plaintiff's behavioral issues stemmed from his disability, Defendant admits to terminating Plaintiff because of his disability.

Plaintiff's argument, however, is misplaced. Employers may discipline employees for misconduct related to the employee's disability as long as the employer's explanation is not a pretext for discrimination. Sever v. Henderson, 220 F. App'x 159, 161-62 (3d Cir. 2007) ("Though an employer is prohibited from discharging an employee based on his disability, the employer is not prohibited from discharging an employee for misconduct, even if that misconduct is related to his disability."); Walton v. Spherion Staffing LLC, 152 F. Supp. 3d 403, 407-08 (E.D. Pa. 2015) ("A survey of federal case law supports [the d]efendant's argument that a disabled person can be lawfully terminated for disability[-]related misconduct — so long as the employer's explanation is not a pretext for discrimination."); see also Alvarez v. Sch. Bd. of Broward Cty., 208 F. Supp. 3d 1281, 1286 (S.D. Fla. 2016) ("The law does not require the [employer] to ignore misconduct that has occurred.") (quoting Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 465 (4th Cir. 2012)). The evidence shows that Defendant terminated Plaintiff based on numerous complaints about Plaintiff's behavior and his recorded work place misconduct.

Second, Plaintiff attempts to show pretext by arguing Plaintiff's "alleged behavioral issues became a reason to dismiss him only after Defendant became aware that they were disability-related." (Resp. to Mot. for Summ. J., at 17.) Plaintiff argues, "Prior to his diagnosis of PTSD, Defendant took no action at all regarding [his] conduct complained of." (Id. at 19.)

Plaintiff's argument here is unsupported by the evidence. Defendant did not tolerate Plaintiff's conduct violations before his alleged diagnosis. After two events significant enough for Dr. Ferguson to report Code of Conduct violations, Plaintiff was placed on administrative leave and sent for a fitness for duty evaluation. These events all occurred before Plaintiff's alleged diagnosis.

Plaintiff states that he was at least unaware of all complaints against him except for one until his post-discharge hearing in July of 2016. The Court believes this unlikely given that Plaintiff was provided two reports of Code of Conduct violations, placed on administrative leave twice, sent to the VCAP and PRC Program, and provided with the Final Warning before his post-discharge hearing. Regardless, Defendant is correct that this argument is misdirected because "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance." Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997), *abrogated on other grounds by* Lewis v. City

of Union City, 918 F.3d 1213 (11th Cir. 2019). Plaintiff does not deny the existence of the complaints against him, and the complaints have been authenticated in the record.

Third, Plaintiff argues that "Defendant's assertion that [Plaintiff's] behavioral issues caused safety concerns lacks support" because "in his multiple altercations with Dr. Ferguson, [Plaintiff] never engaged in physical violence or threatened to harm him."[10] (Resp. to Mot. for Summ. J., at 19-20.) Even if Plaintiff never threatened Dr. Ferguson, the evidence supports that individuals expressed concerns for their personal safety because of Plaintiff. Ms. Webster stated she feared Plaintiff, and the July 2, 2015 Subcommittee Report stated that "several individuals were fearful that [Plaintiff] could experience a personal breakdown in rational thought and proceed to violence (firearms)."

The evidence also supports that individuals reported concerns over patient safety because of Plaintiff. Among other reports, Dr. Salgueiro's October 31, 2014 email stated that Plaintiff "is not aware of his limitations and lacks good clinical judgment." In support, Dr. Salguiero stated that Plaintiff is "unable to

---

[10] The Termination Notice does not list safety concerns as a reason for terminating Plaintiff. (See Termination Notice, at 57-58.) The Termination Notice and Defendant's briefs, however, reference the reported safety concerns. (Id. at 57; Br. Supp. Mot. for Summ. J., at 11, 13, 15.) The Court, thus, analyzes whether by noting concerns with safety, Defendant's reasons for terminating Plaintiff were pretextual.

39

follow directions," "unreliable," and "dangerous." Dr. Salguiero concluded that he "do[es] not feel comfortable assuming the liability for the things [Plaintiff] does in the clinic and [is] very uncomfortable with [Plaintiff] caring for hospital and major surgical cases." Furthermore, the July 2, 2015 Subcommittee Report noted that some people had concerns regarding the boundaries of Plaintiff's "judgment for patient care delivery." (July 2, 2015 Subcommittee Report, at 40.)

The facts here are distinguishable from Plaintiff's cited case, R.W. v. Bd. of Regents of the Univ. Sys. of Ga., because, in R.W., there was an absence of evidence of the nature, probability, severity, and duration of the risk the plaintiff posed. 114 F. Supp. 3d. 1260, 1284 (N.D. Ga. 2015) (finding the nature of the risk posed was an issue of fact because the defendant claimed the plaintiff was a direct threat but "was unable to articulate what specifically [the p]laintiff was at risk of doing."). Here, numerous complaints attribute concerns regarding personal and patient safety to Plaintiff. Plaintiff fails to show that Defendant mentioning safety concerns as a reason for terminating Plaintiff was pretextual. Accordingly, Plaintiff failed to show the existence of a genuine issue of material fact regarding the truth of Defendant's reasons for terminating Plaintiff.

## B. Breach of Contract

Plaintiff argues Defendant breached the terms of the OMFS Program Resident Handbook ("RH") by (1) "failing to provide [Plaintiff] with notice, an investigation, and a hearing before terminating his residency" (Second Am. Compl., ¶ 45) and (2) "ignoring the recommendation of the hearing subcommittee and opting to instead uphold [his] termination" (id. ¶ 46). For the Court to determine whether Defendant breached a contract with Plaintiff, the Court must first determine whether the breach of contract claim is based upon a written contract and, thus, not barred by sovereign immunity.[11] Under the Georgia Constitution, "sovereign immunity extends to the [S]tate and all of its departments and agencies" and "can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver." GA. CONST., art. I, § II, para. IX(e); accord Ga. Dep't of Comm. Health v. Data Inquiry, LLC, 722 S.E.2d 403, 405-06 (Ga. Ct. App. 2012). Furthermore, "[t]he doctrine of sovereign immunity requires that the conditions and limitations of the statute that waives immunity be strictly followed." Ruff, 726 S.E.2d at 456 (citations and internal quotation marks omitted).

---

[11] "The [BOR] is the state agency vested with the governance, control and management of the University System of Georgia. Sovereign immunity applies to the [BOR]." Bd. of Regents of the Univ. Sys. of Ga. v. Ruff, 726 S.E.2d 451, 456 (Ga. Ct. App. 2012) (internal quotation marks and citations omitted) *overruled on other grounds by* Rivera v. Washington, 784 S.E.2d 775 (Ga. 2016).

One such constitutional exception is for "any action ex contractu for the breach of any written contract now existing or hereafter entered into by the [S]tate or its departments and agencies."[12] GA. CONST. of 1983, art. I, § II, para. IX(c). A written contract is required; "[a]n implied contract will not support a waiver of immunity under the provisions of the Georgia Constitution."[13] Barnes, 743 S.E.2d at 611. In addition to a

---

[12] Proving the existence of a written contract may prove that Georgia waived sovereign immunity from a breach of contract suit in state court, but it, alone, does not prove that the State has waived sovereign immunity from suit in federal court. See Barnes v. Zaccari, 669 F.3d 1295, 1308 (11th Cir. 2012) (quoting Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 676 (1999) ("[A] State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation."). "Georgia has not waived its Eleventh Amendment immunity from suit in federal court for breach of contract claims." Id. To bring a breach of contract claim against the State in federal court, then, the State must waive sovereign immunity as to suit in federal court. "Generally, we will find a waiver either if the State voluntarily invokes our jurisdiction, or else if the State makes a 'clear declaration' that it intends to submit itself to our jurisdiction." Id. at 1309 (quoting Fla. Prepaid, 527 U.S. at 675-76). If the Court finds that Defendant waived sovereign immunity as to this breach of contract claim in state court, then, by removing this case from state court (Notice of Removal), Defendant also waived sovereign immunity as to Plaintiff's breach of contract claim in federal court. Meyers ex rel. Benzing v. Texas, 410 F.3d 236, 249-50 (5th Cir. 2005) (citing Lapides v. Bd. of Regents of the Univ. Sys. of Ga., 535 U.S. 613, 614 (2002)) (stating that by agreeing to remove the case, the state voluntarily invoked federal court jurisdiction). As discussed below, the Court finds, however, that Defendant did not waive sovereign immunity as to this breach of contract claim.

[13] Because an implied contract will not waive Defendant's sovereign immunity, Plaintiff must show the Parties intended to be bound to a specific written contract. Bd. of Regents of Univ. Sys. of Ga. v. Barnes, 743 S.E.2d 609, 611-12 (Ga. Ct. App. 2013) (requiring that, to establish a written contract sufficient to waive the State's sovereign immunity, the student had to prove more than just that the state school provided the student a copy of the student handbook; the court had to determine whether the parties "demonstrate[d] their intent to enter into a binding contract"), disapproved of on other grounds by Wolfe v. Bd. of Regents of the Univ. Sys. of Ga, 794 S.E.2d 85 (Ga. 2016). Plaintiff's citations to cases involving private institutions not requiring a demonstrated intent to be bound to the handbook are unpersuasive. (Resp. to Mot. for Summ. J., at 23.) Plaintiff also does not appear to rely on the RH alone as creating a written contract but argues that, for reasons discussed below, the RH is signed by the Parties. (Id. at 21 ("Because the '[RH]' contains all the necessary terms of a contract, is signed by all parties, and is in writing, Defendant is not entitled to sovereign immunity.").

writing, "there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1.

"The party seeking to benefit from the waiver of sovereign immunity bears the burden of proving such waiver." Bd. of Regents of the Univ. Sys. of Ga. v. Doe, 630 S.E.2d 85, 88 (Ga. Ct. App. 2006). Thus, because Defendant asserts sovereign immunity in its motion for summary judgment, Plaintiff "has the burden of showing that the contract sought to be enforced is in writing and contains all of the terms necessary to constitute a valid contract." Data Inquiry, LLC, 722 S.E.2d at 406 (stating the plaintiff has the "burden of producing affirmative evidence to demonstrate that a valid written contract exists in order to establish a waiver of the [d]epartment's sovereign immunity"); see also Barnes, 743 S.E.2d at 611 ("[A]s the party seeking to benefit from this waiver, [the plaintiff], not the Board, had the burden of proof on this issue.").

The main issue in this breach of contract claim is whether the Parties mutually assented to be bound by the Code of Conduct within the RH. When determining whether parties mutually assent to the terms of a contract:

> [C]ourts apply an objective theory of intent whereby one
> party's intention is deemed to be that meaning a
> reasonable man in the position of the other contracting

43

party would ascribe to the first party's manifestations
of assent, or that meaning which the other contracting
party knew the first party ascribed to his
manifestations of assent.

Legg v. Stovall Tire & Marine, Inc., 538 S.E.2d 489, 491 (Ga. Ct.
App. 2000).

Although assent to the terms of the contract may be shown by
the parties signing the written contract, assent may be shown in
other ways. Cochran v. Eason, 180 S.E.2d 702, 704 (Ga. 1971).
The express language in the contract may evidence the parties'
intent to be bound, or, in other instances, "the circumstances
surrounding the making of the contract, such as correspondence and
discussions, are relevant in deciding if there was a mutual assent
to an agreement." Legg, 538 S.E.2d at 491; see also Cochran, 180
S.E.2d at 703-04. "Where such extrinsic evidence exists and is
disputed, the question of whether a party has assented to the
contract is generally a matter for the jury." Legg, 538 S.E.2d at
491.

The following facts are undisputed. As a reminder, Plaintiff
began his residency on July 1, 2012. Plaintiff was provided a
link to the RH as part of his employment processing. (Pl.'s Resp.
to St. Mat. Facts,[14] ¶¶ 24, 26.) There are no signatures on the
RH in the record. (See RH, Doc. 21-5, at 13-126.) The RH contains

---

[14] In this section, the Court cites Plaintiff's Response to Defendant's Statement
of Material Facts only when Plaintiff does not dispute the facts alleged by
Defendant, unless otherwise noted.

a Code of Conduct section that lists procedures to be taken when a resident is suspected of violating the Code of Conduct. (Code of Conduct, Doc. 21-5, at 93-102.)

In July of 2014, Plaintiff was given the OMFS Resident Expectations Memorandum ("REM"). (REM, Doc. 21-7, at 30.) Both Plaintiff and Dr. Ferguson signed the REM on July 2, 2014, two years after being provided the link to the RH. (Id. at 30.) The signatures are directly below the following language:

> I, Billy Laun, have read the above Resident Expectations and understand the rules, regulations, policies and my obligations as a Georgia Regents University College of Dental Medicine Oral and Maxillofacial Surgery Resident/Intern.

(Id.)

Sections II through IV of the REM, pertaining solely to the leave policy, refer to the RH in the sections' titles as follows:

II. Leave Policy: Annual[:] (see Resident Handbook)

. . . .

III. Leave Policy: Medical Leave: (see Resident Handbook)

. . . .

IV. Leave Policy: Professional Leave: (see Resident Handbook)

(Id. at 21.) Apart from the three leave sections, the REM does not refer to the RH.

Plaintiff makes two main arguments to show the RH is a valid written contract. First, by signing the REM as part of the RH,

the Parties signed the entire RH. (Resp. to Mot. for Summ. J., at 23-24.) Second, even if the signed REM was not part of the RH, then (a) the RH was a contemporaneously signed writing to the REM or (b) the REM incorporated the RH.[15] (Id. at 24-27.)

Although the Court views evidence in the light most favorable to Plaintiff, he has the burden to point to specific evidence in the record to show the Parties entered into a valid written contract waiving Defendant's sovereign immunity. For the following reasons, the Court finds Plaintiff failed to show Defendant waived sovereign immunity as to Plaintiff's breach of contract claim.

---

[15] Plaintiff makes no argument and fails to cite to any evidence showing that the Parties exhibited their intent to be bound to the RH in ways other than by signing the REM. (See Resp. to Mot. for Summ. J., at 21-27.) Plaintiff, however, relies heavily on Doe. In Doe, there was an offer of employment requiring further approval by the BOR. 630 S.E.2d at 89. Even though the BOR had not approved the appointment, the Court found there was a valid written contract because the parties "clearly manifested their intent to be bound by their agreement" when the plaintiff began his employment and the school "publicly announced [the plaintiff's] appointment on numerous occasions." Id. Although the court, in Doe, cited the rule from Baker v. Jellibeans, Inc., 314 S.E.2d 874, 876 (1984), allowing signed contemporaneous writings to form a contract, the court did not find that the presence of multiple signed agreements formed the employment contract at issue. Doe, 630 S.E.2d at 89. The court looked outside the seemingly unexecuted employment contract and found the parties' actions evidenced an intent to be bound to the terms of the document. Id. Here, Plaintiff's arguments focus solely on the Parties' signatures on the REM as evidencing their intent to be bound to the RH. Different than the plaintiff in Doe, Plaintiff points to no discussions or actions outside the documents to show the Parties manifested an intent to be bound. Although Doe "is instructive on the issue of whether there exists a written contract sufficient to overcome sovereign immunity" in general (Resp. to Mot. for Summ. J., at 26), it does not require the Court to find the Parties intended to be bound to the RH.

1. <u>The REM as Part of the RH</u>

Plaintiff argues that the RH is a valid contract capable of waiving Defendant's sovereign immunity because it contains all the necessary terms of a contract, is signed by all parties, and is in writing. (Resp. to Mot. for Summ. J., at 21-24.) The Court focuses on whether the Parties, as argued by Plaintiff, showed their intent to be bound to the RH by signing it.

Plaintiff argues that the RH is signed by virtue of Plaintiff and Dr. Ferguson signing the REM. (<u>Id.</u> at 24.) As an initial matter, the Court is unable to verify the authenticity of the RH. Plaintiff cites the Affidavit of Dr. Hanes as authenticating the entire RH. (<u>Id.</u> at 25 ("Here, unlike the handbook in <u>Barnes</u>, the [RH] is authenticated. <u>See</u> Exhibit 2 to Dft's MSJ, Affidavit of Dr. Phillip[] Hanes, at ¶ 7.").) Dr. Hanes, however, did not authenticate the entire RH, only the Code of Conduct policy therein. (Dr. Hanes's Aff., ¶ 7.) Specifically, Dr. Hanes stated, "I have reviewed the Code of Conduct policy contained in Exhibit 1 attached to this affidavit, and it is a true and accurate copy of the Code of Conduct policy in the [RH] at the time that the Plaintiff, Dr. Billy Laun, was a resident in the OMFS program." (<u>Id.</u>)

Even assuming the entire RH has been authenticated, Plaintiff's argument fails. Plaintiff states that the REM is the

last section of the RH and because Plaintiff and Dr. Ferguson signed the last page of the REM, they signed the last page of the RH. (Resp. to Mot. for Summ. J., at 24.) Plaintiff seems to argue that by signing the last page of the RH, the Parties intended for their signatures to bind them to the entire RH. (See id. at 24.) Given what is in the record, the Court cannot accept this argument.

The Table of Contents in the RH provided to the Court sites to the "OMFS Resident Expectations" as being within the RH beginning on "page 103." (RH, at 15.) However, the OMFS Resident Expectations within the RH in the record is not identical to the REM Plaintiff and Dr. Ferguson signed. (Compare RH, at 114–126, with REM, at 20–30.) The signed REM lacks page numbers and includes different terms than the OMFS Resident Expectations within the RH. There is no evidence in the record that the REM Plaintiff and Dr. Ferguson signed was part of or the last page of the RH. Thus, there is insufficient evidence for the Court to accept that the Parties signed the entire RH by signing the REM.

2. The REM as Separate from the RH

a. Contemporaneous Writings

It is true that "[a] written contract can consist of multiple documents 'as long as all the necessary terms are contained in signed contemporaneous writings.'" Bd. of Regents of Univ. Sys. of Ga. v. Winter, 771 S.E.2d 201, 205–06 (Ga. Ct. App. 2015), overruled on other grounds by Rivera, 784 S.E.2d 775; see

48

also Baker, 314 S.E.2d at 876. Broken down, the contemporaneous writing rule contains three requirements. First, the writings must be signed. LaFarge Bldg. Materials, Inc. v. Pratt, 706 S.E.2d 131, 135 (Ga. Ct. App. 2011) (finding "the contemporaneous writing rule inapplicable" because the second document was "unsigned"). Second, the writings must be contemporaneous. Writings are contemporaneous when they are "executed at the same time and in the course of the same transaction." Id. Contemporaneous, however, does not require "perfect or absolute coincidence in point of time. One thing is contemporaneous with a given transaction when it is so related in point of time as reasonably to be said to be a part of such transaction." Dabbs v. Key Equip. Fin., Inc., 694 S.E.2d 161, 165 (Ga. Ct. App. 2010). Third, the party seeking to introduce the signed contemporaneous writing must show that it is necessary to complete the signed document. White House Inn & Suites, Inc. v. City of Warm Springs, 676 S.E.2d 178, 179 (Ga. 2009). The point of allowing the parties to introduce signed contemporaneous writings is "to provide necessary terms not contained in the document at issue, or to correct obvious errors in the document at issue." Id. (citing O.C.G.A. § 24-6-3(a)). "However, the contemporaneously executed document cannot be used to add to an agreement a representation or warranty that is not there." Id. at 179-80.

Plaintiff failed to introduce enough evidence for the Court to find the first two requirements have been met. First, as discussed above, there is insufficient evidence to show the RH is signed. Thus, the contemporaneous writing rule is inapplicable. Second, Plaintiff failed to point to evidence as to when, if ever, the Parties assented to the RH. Although Plaintiff does not have to show the documents were executed at the same time, determining whether a writing is contemporaneous requires knowing when the writings were executed. Without this information, the Court is unable to determine if the RH could be considered a contemporaneous writing.

Turning to the third requirement, Plaintiff fails to argue that the REM is missing necessary terms or is ambiguous in any way. Plaintiff argues the RH and REM make up a binding contract because the REM "is signed by all parties and references the [RH] containing all the necessary terms of residency." (Resp. to Mot. for Summ. J., at 27.) The RH covers similar topics as the REM, however, that does not mean the REM contains insufficient terms. See White House Inn & Suites, 676 S.E.2d at 179–80 (finding the contemporaneously executed easement burdening the land that the fee simple warranty deed covered could not be examined because "[t]he easement, though executed contemporaneously with the warranty deeds, cannot be used to burden the warranty deeds with a restrictive use not contained therein, and the trial court did

not err in so ruling"). Plaintiff has failed to point to how the terms in the REM are insufficient or ambiguous requiring the Court to examine a contemporaneous agreement. See Bulford v. Verizon Bus. Network Servs., Inc., 970 F. Supp. 2d 1363, 1371 (N.D. Ga. 2013) (declining to consider the contemporaneous agreement because "the [p]laintiff is not trying to explain an ambiguity in the [agreement] [but] is trying to add to it") (applying Georgia law), aff'd, 564 F. App'x 449 (11th Cir. 2014). Thus, the Court may not examine the RH as a contemporaneous writing.

It is true that the REM references the RH, however, the references are limited to the three sections in the REM discussing the leave policy. Although these references may be found, as discussed below, to incorporate part or all of the RH into the REM, the references do not show either that the REM on its own contains insufficient terms or that the terms are ambiguous. Furthermore, the references to the RH in no way relate to the RH's Code of Conduct section. Thus, even if the Court looked to the RH as a contemporaneously signed writing to explain or supplement the REM, there is no argument that the explanation or supplementation would extend beyond examining the leave policy section of the RH.

## b. Incorporating Terms

Finally, Plaintiff argues the REM incorporated the entire RH.[16] (Resp. to Mot. for Summ. J., at 27.) As discussed above, the leave policy sections of the REM refer to the RH. If the Court were interpreting a breach of contract claim as to the leave policies applying to Plaintiff, the Court would be empowered to examine the RH's leave policy. Here, however, Plaintiff is arguing the Code of Conduct section in the RH was violated. Thus, Plaintiff must show that a reasonable person could find that the REM incorporated the entire RH or, at the very least, the Code of Conduct section therein.

The Code of Conduct section in the REM does not refer to the RH. Only the leave policy sections reference the RH. It is clear, then, that when the Parties intended to include relevant sections of the RH as part of the REM, they noted that. For the reasons herein, the Court finds that the REM does not incorporate the entire RH or the Code of Conduct section therein.

Having found that neither the RH nor the RH's Code of Conduct section is a written contract between the Parties, Defendant is

---

[16] Plaintiff also argues the reverse, that the RH incorporated the REM. (Resp. to Mot. for Summ. J., at 24.) The Court already decided that the RH itself is not a binding contract. Without showing that the RH is a contract, regardless of the binding nature of the REM, Plaintiff's argument cannot prevail. See Bulford, 970 F. Supp. 2d at 1371 (finding that it was immaterial whether a letter referenced a valid contract because the question is whether the contract incorporated the letter).

entitled to sovereign immunity as to Plaintiff's breach of contract claim.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Doc. 21) is **GRANTED IN PART** and **DENIED IN PART**. Defendant's motion is granted as to Plaintiff's procedural due process, disparate treatment, and breach of contract claims. Defendant's motion is denied as to Plaintiff's failure to accommodate claim. The sole remaining claim, Plaintiff's failure to accommodate claim, shall proceed to trial in due course.

**ORDER ENTERED** at Augusta, Georgia, this 25th day of September, 2019.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA